**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 25, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES L. DeROSA,

     Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

     Respondent-Appellee.

No. 10-7084

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 6:CV-05-00213-JHP-SPS)**

---

Thomas D. Hird (Patti Palmer Ghezzi, with him on the briefs), Assistant Federal
Public Defenders, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Jennifer L. Crabb, Assistant Attorney General (E. Scott Pruitt, Attorney General
of Oklahoma, with her on the briefs), Oklahoma City, Oklahoma, for Respondent-
Appellee.

---

Before **BRISCOE,** Chief Judge, **O'BRIEN** and **MATHESON**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

     Petitioner James DeRosa, an Oklahoma state prisoner, was convicted of two

counts of first-degree felony murder and sentenced to death on both counts. The

two murders that were the subject of his convictions occurred on October 2, 2000. DeRosa unsuccessfully challenged his convictions and sentences on direct appeal, as well as in an application for state post-conviction relief. DeRosa then sought federal habeas relief by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied his petition but granted a certificate of appealability (COA) as to one issue. We, in turn, granted a COA on two additional issues. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we now affirm the decision of the district court.

## I

### *Factual background*

The Oklahoma Court of Criminal Appeals (OCCA), in addressing DeRosa's direct appeal, outlined the relevant background facts of DeRosa's crime:

> Around 9:00 p.m. on Monday, October 2, 2000, James L. DeRosa and John Eric Castleberry talked their way into the rural Poteau home of Curtis and Gloria Plummer and then robbed them, stabbed them, and cut their throats, leaving them dead on the floor. DeRosa and Castleberry then stole approximately $73 and left in the Plummers' tan 1998 Chevrolet pickup truck. The Plummers knew DeRosa, because he had previously worked for them on their ranch. He and Castleberry were apparently allowed into the home, which had a security system, on the pretense of looking for a further work opportunity.FN4
>
>> FN4. Castleberry pled guilty to two counts of first-degree murder and testified against DeRosa, in exchange for a sentence of life without the possibility of parole. This Court's description of what occurred within the Plummer home is based upon Castleberry's trial testimony, which was entirely consistent with the

2

physical evidence in the case.

DeRosa worked for the Plummers during the summer of 1999.FN5  He apparently began plotting to rob them sometime in the spring of 2000.  Chris Ford testified that during March or April of 2000, while DeRosa was renting a room in his home, DeRosa approached him about an elderly couple in Monroe for whom he had worked.  DeRosa said they would be an "easy target" and asked Ford to drop him off at their house, and then DeRosa would go in and rob them.FN6

> FN5.  Janet Tolbert, the daughter of Curtis and Gloria Plummer, testified that DeRosa was allowed to work on the ranch as a favor to his mother.  While DeRosa was working at the ranch, her father would ask Tolbert to check on him and make sure he had plenty of water.

> FN6.  DeRosa told Ford that when the man would pay him, he would just pull out his wallet, which had "big bills" in it, and pay him in cash.  Ford testified that DeRosa planned to "go in there while they were asleep, gag 'em, tape 'em up, and then just leave with some money and take their vehicle[,] so that way he wouldn't have to walk."

On Saturday, September 30, 2000, DeRosa brought up the idea of robbing the Plummers to Eric Castleberry and Scotty White.FN7 The three men were hanging out in a bowling alley parking lot that night, when DeRosa asked White if he would go with him to a house in Howe, which belonged to people for whom he had previously worked, and help him rob the owners.FN8  When White declined, DeRosa asked Castleberry, and Castleberry agreed.  DeRosa claimed that the people "always carried a bunch of money on 'em."FN9 Castleberry testified that he and DeRosa needed money in order to move to Corpus Christi, Texas, to find work. DeRosa spoke to Castleberry again the next day, and Castleberry again agreed to go into the house with DeRosa.  They talked about using guns, but decided to use knives when they were unable to obtain guns.FN10

> FN7. Castleberry and White testified that they had known each other between three and six months at the time, but

3

only known DeRosa for a few weeks. White was initially charged with two counts of first-degree murder, along with DeRosa and Castleberry. He testified against DeRosa at both the preliminary hearing and at trial. By the time of the trial, his charges had been reduced to two counts of accessory after the fact. He later pled guilty to these charges and was sentenced to two twenty-five year sentences, run concurrently, with the last seven years on supervised probation.

FN8. Howe and Monrore [sic] are small towns in LeFlore County located near the Plummers' home.

FN9. Castleberry and White both testified about the events leading up to and following the robbery and killing of the Plummers. Their testimony was almost entirely consistent.

FN10. Castleberry asked his friend Justin Wingo about getting a gun; and Christopher Ables testified that on that same Sunday, DeRosa asked Ables if he knew where he could get a gun.

On Monday, October 2, 2000, while DeRosa, Castleberry, and White were driving back to Poteau from Fort Smith, Arkansas (where they had been visiting a friend in the hospital), DeRosa told the others, "we're going to do it tonight." They agreed that White would drop DeRosa and Castleberry off at the house, where they would rob the Plummers and steal their old truck, and then White would meet them at the top of Sugarloaf Mountain, where they would abandon the truck. After attempting to track down Mavis Smith, a sister of the friend in the hospital, and getting pulled over for speeding,FN11 the men went to their various homes to prepare for the robbery. DeRosa obtained a white batting glove or golf glove from his home, but when he couldn't find "the other one," he got a sock to wear on his other hand. He told the others that he was going to get his mother's gun, but then decided against it, since it was registered in her name. Castleberry already had two knives in his car, and they decided to use those instead.FN12 Castleberry also had thick black rubberized gloves for himself in his car.

4

FN11. Highway Patrol Trooper Jim Sommers testified that at 7:10 p.m. that night, he pulled both Castleberry and Smith over for speeding, and that White and DeRosa were in Castleberry's car.

FN12. Castleberry testified that one of the knives was a green-handled, "old-timer knife," approximately twelve to fourteen inches long, and that the other was a lock-blade buck knife, which was about eight to nine inches long with the blade open. Castleberry and White both testified that Castleberry took the green-handled knife, and DeRosa took the buck knife.

DeRosa gave White, who was by then driving Castleberry's car, directions to the Plummer home, and they arrived at approximately 9:00 p.m. DeRosa told White to check back in about ten to fifteen minutes, in case someone else was in the home. White did so, and after seeing lights on throughout the home and no sign of his friends, drove on to Sugarloaf Mountain.FN13 Meanwhile, DeRosa and Castleberry, who were not wearing disguises or masks, rang the bell at the Plummer home and were allowed in by Mrs. Plummer, in order to talk to Mr. Plummer about possible work opportunities.FN14 Mr. Plummer was in the den watching Monday Night Football. After chatting in their den for a few minutes, DeRosa pulled out his knife, held it to the neck of Mr. Plummer, and told him to sit still. When Mrs. Plummer grabbed the cordless phone and started trying to dial, Castleberry yanked the base of the phone out of the wall, pulled out his knife, held it to Mrs. Plummer's neck, and told her to sit still.

FN13. White testified that he waited on top of Sugarloaf Mountain for thirty to sixty minutes and then came down to the bottom and waited another twenty minutes. He was about to leave when he saw DeRosa drive past, headed up the mountain, in the Plummers' truck.

FN14. Castleberry testified that it was DeRosa's idea to get into the house by asking about jobs.

DeRosa stayed in the den with the Plummers while Castleberry began going through bedrooms looking for things to steal. While he was in the second bedroom, he heard DeRosa yell for him to come

back and help him.  Castleberry ran back to the den and observed DeRosa, now standing near the door to the kitchen, struggling with the Plummers.  Castleberry testified that he saw DeRosa stabbing at both of them and that he saw blood "all over" Mrs. Plummer.FN15 Castleberry also observed blood on the front and the side of Mr. Plummer and saw DeRosa stab Mr. Plummer in the chest.FN16

> FN15. The medical examiner, Dr. Andrew Sibley, testified regarding all of the wounds to Curtis and Gloria Plummer.  Mrs. Plummer had five stab wounds to her back, one of which entered her left lung and another of which went into the liver.  Both of these wounds could have been fatal in time.  She also had a stab wound in her upper chest area, which passed into the left lung and also the aorta, which would have been fatal within three to five minutes; an incised wound to her left forearm, possibly a "defensive wound"; and a similar wound to the left side of her chin.

> FN16. Mr. Plummer had two stab wounds on his front side, one in the abdominal area and one to the right collarbone area.  He also had superficial wounds on the upper left side of his chest, and one of the stab wounds on his back was on the lower right side.

Castleberry testified that he then went up behind Mrs. Plummer, stuck his knife to her throat, slit her throat, and pulled her backwards and threw her down on the loveseat.FN17  Castleberry then stabbed Mr. Plummer "a couple of times" in the back.FN18  DeRosa then pushed Mr. Plummer back toward the love seat and the television.  Castleberry testified that Mr. Plummer picked up the cordless phone, which was on the floor, and begged the men to let him call an ambulance for his wife, saying he would give them anything they wanted if they would just let him get help for his wife. DeRosa responded by picking up a marble-topped end table and throwing it at him.  The table hit Mr. Plummer on the head, and he fell to the ground.FN19  DeRosa then walked over and slit his throat, from ear to ear, and left him laying on the floor.FN20  Castleberry then pulled Mrs. Plummer down off the loveseat and left her facedown on the floor, near Mr. Plummer.FN21

6

FN17. Mrs. Plummer had two significant wounds to her neck and throat area. One was a long wound on the bottom left side of the chin, extending down onto the neck. According to Dr. Sibley, the "question mark shape" of this wound indicated "movement" going on between the knife and the victim, and the wound would have been fatal over time. The other wound was a very jagged and complex wound on the right side of the neck, approximately four inches in length. This wound transected the windpipe and the right carotid artery and jugular vein. Dr. Sibley testified that the skin flaps and jagged edges of the wound indicated multiple passes or a "sawing action."

FN18. Mr. Plummer had four stab wounds on his back. One of the wounds passed into the left lung and produced a significant amount of blood loss into the chest cavity. Another wound passed into the right lung. These two wounds would likely have been fatal over time, but not immediately.

FN19. Mr. Plummer had a blunt force wound to the left side of the head, as well as abrasions to the left side of his face and a significant cut on his right cheek.

FN20. The incised wound on Mr. Plummer's neck was about seven inches in length and transected the trachea, the esophagus, and all the major arteries and veins in the neck, passing all the way to the spinal column. Dr. Sibley noted that the jagged areas around the wound did not indicate a "single pass," but rather a repositioning and "sawing type of motion."

FN21. The numerous pictures of the crime scene that were entered into evidence were entirely consistent with Castleberry's description of what happened.

The men then began ransacking the house looking for cash and other valuables, but they found only Mr. Plummer's wallet and Mrs. Plummer's purse. DeRosa took the cash out of the wallet, and Castleberry dumped the purse onto the laundry room floor and took

7

the cash.FN22  When they couldn't find the keys for the older white pickup parked outside, they decided to take the much newer, tan Chevrolet pickup that was parked in the garage.  DeRosa drove the truck to the top of Sugarloaf Mountain, but decided not to leave it there, thinking it would be "too obvious."  They met White on their way back down.  DeRosa told White to wait for a few minutes and then meet them at the Poteau City Lake.

> FN22. Castleberry testified that DeRosa said there was $73 in Mr. Plummer's wallet and that DeRosa took the cash and stuck it in his pocket.

Castleberry testified that when they got to the City Lake, they "[p]ut the truck in the water and got in the water and rinsed the blood off us and changed clothes."  White testified that as he pulled up, he could see the back of the truck and its taillights, as the truck sank into the lake.  DeRosa and Castleberry put their wet, bloody clothing into a black plastic garbage bag and put on fresh clothing, from out of Castleberry's car.  Castleberry testified that he put all of his wet clothing into the bag except his underwear, which he couldn't find, and that he threw his gloves and his knife into the lake.FN23  DeRosa put his knife into the bloody sock that he had worn on his hand and threw it into the water too.FN24

> FN23. On October 4, 2000, Castleberry's still damp underwear was discovered on the ground near where the truck had been submerged.  On October 12, 2000, an investigator found his two black rubber gloves floating in the lake, approximately 100 feet apart.

> FN24. Although investigators searched the lake for the knives, they were never recovered.

The three men then got back in Castleberry's car, drove to Taco Bell, and bought themselves tacos using the money they had stolen.  Before dropping White off later that night, Castleberry told White that they "ended up having to kill 'em."FN25  White was also told that Castleberry and DeRosa were leaving for Corpus Christi the next morning.

> FN25. White testified that while they were at the Lake,

DeRosa told him that they had stolen $63 from the Plummers and "trashed the house." White stated that he "felt something wasn't right," after seeing DeRosa's white baseball glove, with blood on it, on the ground. White testified that before he was dropped off at home that night, he asked what happened, and Castleberry said, "We didn't only rob 'em, we killed 'em." White also testified that DeRosa stated that he had stabbed the old man in the back and cut his throat, and that he had picked up a marble table and thrown it at the old man. DeRosa was worried about leaving fingerprints on the marble table. White testified that he did not know beforehand that anyone was going to be hurt or killed in the robbery.

Castleberry and DeRosa later went to a campground area and burned the clothing in the garbage bag, after spraying lighter fluid on it. They were afraid that DeRosa's combat boots would not burn fully, so they dropped them over a bridge near Keota Landing. Later that night Castleberry told their friend Justin Wingo, in DeRosa's presence, that they had just killed two people and how they had done it.FN26 The next day Castleberry and DeRosa drove to Corpus Christi, Texas, to the home of Castleberry's father.

FN26. Wingo testified that he was riding in the front passenger seat of Castleberry's car, with Castleberry driving and DeRosa in the back, when Castleberry told him that they went to the home of two people, who DeRosa used to worked for, and robbed them, stabbed them, slit their throats, took their money, and then stole their truck and drove it into the City Lake. Wingo testified that Castleberry was doing most of the talking, but that DeRosa was "agreeing with it and backing it up," and that DeRosa said that he had "killed the old man . . . . hit him in the head with an end table and slit his throat and stabbed him." Wingo testified that he thought Castleberry was playing a joke on him, but that when he found out, the next day, about a statewide manhunt for Castleberry and DeRosa, he told his parents what he knew, and they called the police.

The Plummer bodies were discovered the morning of October 3, 2000.FN27 On the morning of October 4, 2000, Scotty White, who was eighteen years old and a high school senior at the time, informed a teacher at his high school that he knew who killed the Plummers. Later that morning he met with Sheriff Kendall Ballew and investigator Shawn Ward, in the principal's office, and told them that DeRosa and Castleberry had killed the Plummers, how they did it, what they did with the Plummers' truck, and that they had left for Texas. After the interview the officers discovered the truck in the Poteau City Lake, right where White said it would be.

> FN27. The bodies were discovered by Roger Murray, who worked for the Plummers around the ranch at the time, and Tonya Woodruff, their granddaughter. Murray contacted Woodruff, who lived nearby and had a key to the home, when the Plummers did not answer their door that morning.

Although White initially tried to minimize his own involvement, saying that the other men just told him about what had happened, the investigating officers were suspicious about the extent of his knowledge, and took him to the district attorney's office for further interviewing. Shortly after 1:00 p.m. that afternoon, after White was Mirandized, he told the investigating officers additional details about what had happened, including the fact that he had dropped the others off at the Plummer home. In a third interview, conducted after a break of only a few minutes (in order for White to look at an atlas), White told them that DeRosa and Castleberry had gone to Corpus Christi.

Castleberry and DeRosa were arrested by local officers in Corpus Christi, outside the home of Castleberry's father, that same evening. When the arresting officer informed DeRosa that he was being arrested on two counts of first-degree murder in an Oklahoma case, DeRosa said, "Yeah, I heard about what happened to those people. We had just visited 'em so my prints are probably out there." Sheriff Ballew and Shawn Ward arrived in Corpus Christi on October 5, 2000, to transport DeRosa and Castleberry back to Oklahoma. After being advised of his Miranda rights and agreeing to waive them, Castleberry agreed to talk with Ballew and Ward. Though he initially denied involvement in the Plummer killings, Castleberry

10

> then relented, and in a tape-recorded interview, told Ballew and Ward essentially the same detailed story that he testified to at trial.

DeRosa v. State, 89 P.3d 1124, 1129-1133 (Okla. Crim. App. 2004) (DeRosa I).

*The state trial proceedings*

On October 4, 2000, DeRosa was charged by information in the District Court of LeFlore County, Oklahoma, Case Number CF-00-635, with two counts of first-degree felony murder. The prosecution subsequently filed a bill of particulars alleging that DeRosa "should be punished by death due to the following aggravating circumstances": (1) the murders were especially heinous, atrocious, or cruel; and (2) the murders were committed for the purpose of avoiding or preventing lawful arrest or prosecution. State ROA at 101, 105, 220.

Three attorneys from the Oklahoma Indigent Defense System (OIDS) were appointed to represent DeRosa: James Rowan, Jason Spanich, and James Lockard.

The case proceeded to trial on October 15, 2001. At the conclusion of the first-stage evidence, the jury found DeRosa guilty of both counts of first-degree felony murder. The case proceeded immediately to the sentencing phase of trial. At the conclusion of the second-stage evidence, which incorporated by reference all of the first-stage evidence, the jury found the existence of both alleged aggravating circumstances with respect to each of the counts of conviction. The jury in turn fixed DeRosa's punishment at death for each of the two counts of conviction.

11

On October 19, 2001, the state trial court formally sentenced DeRosa to death for each of the two murder convictions. Judgment in the case was entered on November 30, 2001.

*DeRosa's direct appeal*

DeRosa's lead trial attorney, OIDS attorney James Rowan, filed a notice of intent to appeal on his behalf. James Lockard, one of the OIDS attorneys who was appointed to represent DeRosa at trial, continued to represent DeRosa on direct appeal and filed an appellate brief asserting nine propositions of error.

On April 22, 2004, the OCCA issued an opinion affirming the convictions and sentences. DeRosa I, 89 P.3d at 1158. DeRosa, after unsuccessfully seeking a rehearing from the OCCA, filed a petition for writ of certiorari with the United States Supreme Court. That petition was denied on January 10, 2005. DeRosa v. Oklahoma, 543 U.S. 1063 (2005).

*DeRosa's application for state post-conviction relief*

On March 25, 2004, DeRosa, represented by private counsel, filed an application for state post-conviction relief and a verified motion for evidentiary hearing on his post-conviction claims. In his first proposition of error, DeRosa alleged that his trial counsel was ineffective for failing to (a) rehabilitate a prospective juror regarding her willingness to consider the death penalty; (b) object to the district attorney's efforts to limit the jury's consideration of mitigating evidence; and (c) request that the state trial court instruct the jury

12

regarding DeRosa's right not to testify. In his second proposition of error, DeRosa argued that his appellate counsel was ineffective for failing to raise the four distinct issues on direct appeal. In his third proposition of error, DeRosa asserted a claim of cumulative error, arguing that the combination of errors raised in his direct appeal and on post-conviction rendered his death sentences unconstitutional.

On May 3, 2004, less than one month after it denied DeRosa's direct appeal, the OCCA issued an order denying DeRosa's application for post-conviction relief and his motion for an evidentiary hearing. The OCCA concluded that all of DeRosa's claims of ineffective assistance of trial counsel were procedurally barred due to DeRosa's failure to assert them on direct appeal. The OCCA in turn rejected DeRosa's ineffective assistance of appellate counsel claims on the grounds that the failure of DeRosa's appellate counsel to raise the issues identified by DeRosa did not constitute deficient performance. Lastly, the OCCA concluded that DeRosa's claim of cumulative error was barred by res judicata.

*DeRosa's federal habeas proceedings*

DeRosa initiated these federal habeas proceedings on May 13, 2005, by filing motions for appointment of counsel and to proceed in forma pauperis. The district court granted those motions and appointed counsel to represent DeRosa.

On December 23, 2005, DeRosa's appointed counsel filed a petition for

13

writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition asserted twelve grounds for relief: (1) that trial counsel's failure to investigate fully and to present readily available evidence in mitigation denied DeRosa effective assistance of counsel and a fair sentence procedure; (2) the denial of DeRosa's change of venue motion deprived DeRosa of a fair trial; (3) DeRosa's right to a fair jury was violated when the trial court excused improperly a prospective juror who was able to consider all sentencing options; (4) the improper actions of the prosecutor denied DeRosa a fair trial and reliable sentencing; (5) the irrelevant and inadmissible comments of witness Janet Tolbert denied DeRosa a fair trial and sentencing determination; (6) admission of the victim-impact evidence denied DeRosa a fair trial; (7) DeRosa was deprived of a fair sentencing determination due to the trial court's failure to instruct the jury that it had to find beyond a reasonable doubt that the aggravating circumstances found to exist outweighed the mitigating circumstances, and DeRosa's appellate counsel was ineffective for failing to present this claim on direct appeal; (8) the murder-to-avoid-arrest aggravating circumstance was not established by sufficient evidence and was unconstitutional as applied to DeRosa; (9) the heinous, atrocious, or cruel aggravating circumstance was not properly defined; (10) the jury was not told that DeRosa had a constitutional right not to testify; (11) the cumulative effect of numerous errors denied DeRosa a fair trial under the Eighth and Fourteenth Amendments; and (12) the lethal injection protocols proposed to be used by the

14

State of Oklahoma violate the Fifth, Eighth, and Fourteenth Amendments.

On September 27, 2010, the district court issued an opinion and order denying DeRosa's petition. Judgment was entered in the case that same day.

DeRosa filed a timely notice of appeal and a motion for COA. On November 1, 2010, the district court granted DeRosa a COA with respect to his ineffective assistance of trial counsel claim, but denied DeRosa's motion with respect to all of the other issues asserted in the petition.

We subsequently granted DeRosa a COA with respect to two additional issues: (1) whether the cumulative effect of the improper comments of the prosecuting attorney made during both phases of trial was harmless; and (2) whether allowing the jury to hear the responses of two victim-impact witnesses who testified during the penalty phase of trial was harmless constitutional error.

II

Our review of DeRosa's appeal is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id.

If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established

15

Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal quotation marks omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. That is, because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. McLuckie, 337 F.3d at 1197.

III

*Ineffective assistance of trial counsel*

In Proposition One of his appellate brief, DeRosa contends that his trial counsel was constitutionally ineffective for failing to contact and present during the second stage of trial "crucial, obvious witnesses available and willing to

16

testify" on DeRosa's behalf. Aplt. Br. at 9. In support, DeRosa argues "that the entire mitigation effort [at trial] flowed from, and was shaped by, [his] mother Cassie (Naydan) DeRosa." Id. at 14. But, he argues, "Cassie DeRosa was, in truth, a raging sociopath with an unimaginably destructive effect on [him]," and "[t]his is a horror story, both biologically and environmentally, that the jury should have heard." Id. In turn, DeRosa contends that his counsel should have located and presented as witnesses during the second-stage proceedings (a) his maternal grandmother, Connie Naydan Carroll, (b) his father, James Money, (c) his maternal uncle, Michael Naydan, (d) his high school counselor, Virginia Poe, and (e) his high school track coach, Stan Stone.

*a) Exhaustion of state court remedies*

It is undisputed that DeRosa never presented his claim of ineffective assistance of trial counsel to the Oklahoma state courts for review. Generally speaking, we may not review a claim for federal habeas relief unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). AEDPA, however, allows for a "State, through counsel, [to] expressly waive[] the [exhaustion] requirement." 28 U.S.C. § 2254(b)(3). And respondent in this case has done precisely that. Accordingly, we shall proceed to review de novo the merits of DeRosa's claim.[1]

---

[1] At our direction, the parties filed supplemental briefs addressing the

(continued...)

17

*b) Applicable federal law*

DeRosa's claim is governed by the standards outlined in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In <u>Strickland</u>, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." <u>Id.</u> at 687. "First," the Court noted, "the defendant must show that counsel's performance was deficient." <u>Id.</u> "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense." <u>Id.</u> "Unless a defendant makes both showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." <u>Id.</u>

Notably, the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing

[1](...continued)
United States Supreme Court's recent decision in <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012). "The precise question" at issue in <u>Martinez</u> was "whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." <u>Id.</u> at 1315. Because respondent has expressly waived the exhaustion requirement and is not asserting procedural default, we conclude that <u>Martinez</u> has no impact on this case.

18

professional norms.'"  Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 688).  There is a strong presumption that "an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct might have been part of a sound trial strategy."  Bullock v. Carver, 297 F.3d 1036, 1046 (10th Cir. 2002) (emphasis omitted).  And, because "[t]here are countless ways to provide effective assistance in any given case," "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  Strickland, 466 U.S. at 689.

*c) The merits of DeRosa's claim*

As a threshold matter, it is well established that "insufficient preparation of the mitigation case can constitute ineffective assistance of counsel."  Wilson v. Sirmons, 536 F.3d 1064, 1142 (10th Cir. 2008) (citing Williams v. Taylor, 529 U.S. 362, 395 (2000)).  "But this is so only if the investigation fails to . . . uncover significant mitigating evidence."  Id. at 1143.  And, even if counsel's performance is determined to have been deficient, DeRosa must further establish that the deficient performance prejudiced his defense.  Strickland, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

In order to assess both prongs of the Strickland test, we shall begin by reviewing the mitigating evidence that was actually presented by DeRosa's trial

19

counsel. We will then review the additional mitigating evidence that DeRosa now contends should have been presented.

*Mitigating evidence presented at trial:*

At the sentencing phase of trial, DeRosa's appointed counsel presented testimony from the following five witnesses:

*Jason DeRosa* - Jason is DeRosa's older half-brother (they have the same mother, but different fathers). Jason testified at length about DeRosa's unstable and painful childhood, including the fact that, when DeRosa was approximately three years old, their mother Cassie, in order to facilitate her own military training, left them in a full-time daycare center for a lengthy period of time, at the end of which their maternal grandmother retrieved them and took them to Dallas to live with her for approximately three years. From there, Jason testified, DeRosa was taken in by his biological father, James Money, Sr. (Money), and DeRosa lived with Money and his new family for approximately five years. At the approximate age of eleven, DeRosa moved to Indianapolis to live with his mother, her new husband, James DeRosa Sr. (DeRosa Sr.), and Jason. In 1992, DeRosa Sr. died while on active duty in the military. Jason testified that "[t]here was no structure to [DeRosa's] life, through the . . . whole childhood and up until he was an adult," Tr. at 602, and that DeRosa "felt like he didn't belong a lot of times," id. at 603. Jason further testified that he loved DeRosa and he asked the jury to spare DeRosa's life.

*Cassie DeRosa* - Cassie, DeRosa's mother, testified that DeRosa was born on March 17, 1977, in Irving, Texas, and that at the time of his birth their family included herself, her then-husband, Money, and her son Jason. A few weeks after DeRosa was born, she testified, Money stole approximately $1,500 from his employer and fled to San Francisco. Money returned to Irving approximately four months later. Shortly thereafter, Cassie testified, she came home one day to find Money on the couch with a male lover. She testified that she responded by moving out of the family's house with her two sons, and proceeded to try to raise them by herself.

According to Cassie, her mother did not help her with raising the two boys. She testified: "My mother doesn't – my mother never cared for me. A few years ago, she finally gave me an answer when I asked why, and she said, well, you were defective. So she never liked me much. She never – when she wanted something or needed me, or needed help or wanted something, then I was her daughter, and other than that, I wasn't her daughter and she didn't care for Jimmy, Jr. [i.e., DeRosa.] Jimmy, Jr. looked like me, from the day he was born he was defective, and so it's like she – she loved Jason, and loved him above everything, but the other two-thirds, you know, didn't count." Id. at 610.

Cassie testified that on the morning of November 28, 1978, she enlisted in the military, and later that afternoon filed for divorce from Money. She testified that she did so in that particular order because she would not have been allowed

21

to enlist if she was a single mother. According to Cassie, she left for basic training in late December 1978, and her mother agreed to take care of Jason, "but she didn't keep [DeRosa]." Id. at 612. DeRosa was apparently left to be cared for by a roommate of Cassie's. Later on, Cassie testified, she was selected to attend a drill sergeant academy in Fort Leonard Wood, Missouri. Her mother, she testified, refused to take her boys because of the expense, and instead "located this daycare center at Lawton[, Oklahoma, that was] specifically tailor-made to military people with children that get called out." Id. Cassie testified that she proceeded to place her sons in the daycare center and left for training. When she returned approximately two-and-a-half weeks later, she testified, her "mother had been there earlier that day" and had "taken [her] kids on grounds of abandonment."[2] Id. at 614. Cassie testified that she had given the director of the daycare center a letter forbidding them from allowing her mother to take custody of the boys, but she testified that her mother forged a document in order to obtain their custody. Cassie also testified that her mother obtained restraining orders prohibiting Cassie from having contact with her boys, and that when she (Cassie) actually attempted to visit her boys on one occasion, her mother threatened to kill her and chased her away at high speed in an automobile.

---

[2] The other evidence presented at trial, as well as the additional evidence now pointed to by DeRosa, indicates that Cassie in fact left the boys in the daycare center for at least a month.

22

Cassie testified that approximately two months after her mother took the boys from the daycare center, her mother sent DeRosa to Boston to live with Money.

According to Cassie, when she remarried DeRosa Sr. in 1985, her mother told her she deserved her children and could have them back. She testified that Jason returned to live with her in 1987, and that DeRosa returned to live with them in April 1988. Cassie testified that she soon realized, however, that DeRosa was "a handful" and had problems with authority and discipline. Id. at 618.

In August 1988, Cassie testified, she, DeRosa Sr., and the two boys moved to Germany. In Germany, DeRosa engaged in inappropriate behaviors and eventually had to be sent back to Arkansas to be admitted temporarily to a hospital psychiatric unit for treatment for concentration hyperactivity disorder and severe depression. According to Cassie, DeRosa was depressed about the physical and mental abuse he had suffered, and she testified that they suspected he had been sexually molested at some point by Money. Cassie testified that DeRosa, "even at sixteen, seventeen, eighteen, nineteen years old" would "just stand in the middle of the room and scream," and that she would hold him in a rocking chair and he would say, 'Make the pain go away, mom. Make the pain go away.'" Id. at 623.

Cassie opined that she likewise suffered from depression and concentration hyperactivity disorder, and she testified that after her mother took her boys, she

23

"ended up becoming a functioning alcoholic for quite sometime until [she] went and got . . . psychological treatment." Id. at 625.

After DeRosa was discharged from psychiatric treatment, he attended high school in Oklahoma. Cassie testified that DeRosa was smart, but was bored with school and had problems with his grades. And she testified that he would intentionally fail or make bad grades in order to prevent good things from happening. "It was almost like he didn't want anything good to happen to him," she testified. Id. at 629.

Following graduation from high school in 1995, Cassie testified, DeRosa joined the Army. He received a bad-conduct discharge, however, for stealing a car, and was sentenced to ten months in the military correctional facility at Fort Sill, Oklahoma. After completing that sentence, Cassie testified, DeRosa returned to Poteau, Oklahoma, and lived with her for some time while working a series of low-paying restaurant and retail jobs.

In April 1999, Cassie testified, she began working for the Plummers, helping to maintain all of the houses, lawns, and equipment on their rural property. Cassie testified that from mid-August to mid-September of 1999, she had to leave Poteau to attend a thirty-day annual training session with the Army reserves, and during that time the Plummers agreed to allow DeRosa to fill in for her.

Ultimately, Cassie testified that, although she did not condone DeRosa's

24

actions in robbing and murdering the Plummers, she still loved him, and she asked the jury to spare his life. In doing so, she stated: "He didn't deserve the life that he has had to live. There's no fault of his own. He's lived a life that I didn't choose for him, I didn't want for him, and I couldn't change what happened to him." Id. at 635. She also told the jury, "My son's a good boy – he is a good boy. His thought patterns don't work well sometimes and he doesn't see beyond a certain thing." Id. at 636.

*Marlene Sharp* - Marlene is DeRosa's half-sister; she and DeRosa have the same biological father (Money), but different mothers.[3] Marlene, who is approximately eleven years older than DeRosa, testified that she first had contact with DeRosa when he was one year old and living in Irving, Texas, with Cassie, Money, and Jason. Approximately three years later (when DeRosa was four years old), she testified, the two of them lived together with their father for several months (as noted, DeRosa was removed from the daycare center by his maternal grandmother and then sent to Boston to live with Money; Marlene was spending the summer with Money). During that summer, she testified, their father was never around, so she and DeRosa were always together. At some point, she testified, he began calling her "mom," and she tried to explain to him that she

_____

[3] According to DeRosa and some of the materials in the record, the proper spelling of her name is "Marlien." Because, however, the state trial transcript spells the name as "Marlene," we will likewise use that spelling.

wasn't his mother.  Id. at 639.  Marlene ultimately left Boston, she testified, because she woke up one night to find her father sexually abusing her.

Marlene testified that she had no contact with DeRosa from that point until he and their father moved back to Texas.  There, she testified, she began seeing DeRosa at least once a month.  She testified that DeRosa was worried all the time and depressed.

Marlene testified that she moved back in with her father and DeRosa in an attempt to rebuild her relationship with her father.  While she lived at their father's house, she testified, DeRosa "would get beat for wetting the bed," would have plates and dishes thrown at him, and "would take the spankings" for the misconduct of Timothy, their father's new son.  Id. at 641.  Marlene testified that she ended up leaving her father's house after six weeks because she couldn't take things anymore.

At some point after she moved out, Marlene testified, her father informed her that he was going on the road to be a truckdriver.  She testified that she was scared for DeRosa, who was approximately nine or ten at the time, to stay alone with Vicki, her father's new wife, because Vicki was the one who had been abusing DeRosa.  Consequently, she testified, she asked her father not to leave DeRosa alone with Vicki.  Her father, in response, told her that Cassie had asked to have custody of DeRosa, and Marlene begged her father to allow DeRosa to move in with Cassie.  Although her father agreed, she testified that, up until that

26

point in time, DeRosa did not know that Cassie was his mother.

Marlene testified that DeRosa's childhood was "[h]ard" and that he "[a]lways got in trouble for stuff that he didn't do." Id. at 642. She testified that she loved DeRosa and wanted to continue to have a relationship with him even if he was in jail. Ultimately, she stated to the jury: "I don't want to lose him again. It's hard. It's hard to be taken away from people that you loved, and just one day they're there and one day they're not, and it happened to him all his life. He had me, then I was gone. Cassie, that he didn't even remember. You know, my dad abandoned him, and everything. It's – I'm begging y'all not to take him from me again." Id. at 643.

*Wanda Draper* - Draper, who has a Ph.D. in human development with a specialization in education, is a professor emeritus from the University of Oklahoma College of Medicine. At defense counsel's request, she analyzed the factors that impacted DeRosa's development. In doing so, she testified, she interviewed DeRosa on two occasions, interviewed a number of his family members, and studied the available medical records.

Draper testified that what she "found was a child who started out with a very difficult traumatic troubled kind of life because of the early problems going on in the family into which he was born, and so he never really had a particular family with whom he lived or grew up with. He moved back and forth and among various family members and sometimes was left without any of those anchor

27

people, so he really never had an attachment – never had an attachment to his mother because she left very early in his life, leaving him to be cared for by others: One was her own mother or his maternal grandmother." Id. at 650-51.

Draper testified that she interviewed Connie Carroll, DeRosa's maternal grandmother, as well as Cassie DeRosa, DeRosa's mother. Draper testified that there was ongoing animosity between these two women, "and they each indicate[d] that they fe[lt] very strongly about the antagonism that they fe[lt] and the anger they fe[lt] toward one another." Id. at 651. This animosity, Draper testified, negatively impacted DeRosa's development.

According to Draper, she found a pattern of abandonment in DeRosa's life. She testified: "I specifically counted about seven times that he was abandoned. I think there are actually more than that, but seven particular times that he was abandoned by a significant person or someone he certainly considered to be significant in his life." Id. at 652. "[A]bout the third time that a child has to change the significant attachment figures in his life," Draper testified, "a child will begin to resist or back off from that attachment." Id. And, she testified, for a child to even ask "who's my mother" "means that child has no attachment." Id. at 653.

Draper testified that Connie, DeRosa's grandmother, disciplined him as a young child for starting fires. Connie told Draper that DeRosa "had been playing with matches and set a couple of fires in the house, and so she said [she] wanted

28

to teach him a lesson and so . . . she put him in one end of the bathtub, and in the other end she wadded up newspapers and she set the newspapers on fire and let them burn closer and closer to him, and she told him this is what happens if you set fires. You could easily get burned and people could get burned with this, and so he was screaming, of course, and crying." Id. at 655-56. Draper opined that DeRosa "probably didn't hear or understand what the message was." Id. at 656.

Draper testified that when DeRosa was living with Connie, Connie was working two jobs and had very little extra time. Consequently, Draper testified, DeRosa went to a children's center each morning, and then would accompany his older brother Jason to elementary school and would sit in the back of Jason's classroom all afternoon. This practice, Draper testified, continued until Jason was in the fourth grade.

Draper testified that DeRosa experienced bedwetting problems for many years, and that when he was living with Money and his wife Vicki, Vicki "would whip [DeRosa] because he wet the bed." Id. at 658. According to Draper, the one thing that DeRosa could count on was that he would be punished if he misbehaved. As a result, she testified, misbehaving provided a form of stability because DeRosa knew what was going to happen to him. Relatedly, Draper explained that DeRosa had "assumed disability," which she testified occurs "where a child can't seem to succeed in any way that is appropriate, so they succeed as a failure." Id. at 660.

29

Draper testified that although DeRosa Sr. was, by all accounts, "a pretty decent human being," id. at 661, DeRosa could not form an attachment with him because DeRosa did not know if he would be abandoned again. Further, Draper testified, DeRosa didn't trust his mother enough to make an attachment with her either. "[I]f [Connie] the grandmother had taken [DeRosa] in and nurtured him and really cared about him," Draper testified, DeRosa "might have made it with that, but" Connie did not do so. Id. at 663. In short, she testified, "[he] had no single consistent person in his life." Id. at 664.

Draper opined that DeRosa "had a serious disorganized attachment disorder" that "developmentally hinder[ed] him." Id. at 666. And in light of this disorder, she testified, she was "not surprised that he had these problems," id., and "grew up to be a very troubled person," id. at 669.

*Michael Gelbort* - Gelbort, a clinical neuropsychologist, testified that he was hired by defense counsel to run a battery of tests and evaluate DeRosa. According to Gelbort, DeRosa was in "the high average to superior range in terms of his nonverbal" ability, "[b]ut in dramatic, or really marked contrast, his left hemisphere, the verbal, logical side of [his] brain [wa]s – it[ was] as if [it was] from a different person." Id. at 684. More specifically, Gelbort testified that there was a difference of nearly two standard deviations between DeRosa's nonverbal ability and his verbal/logical ability, and he explained that this "doesn't happen by chance." Id. Gelbort opined that it meant "that something happened to

30

the left side of [DeRosa's] brain" and that DeRosa was "demonstrating left frontal deficits." Id.

Gelbort proceeded to explain in more detail the purpose of the left frontal lobe of the human brain. "It's the most evolved part of the human brain," he testified, "and what causes human beings to be able to be very sophisticated in their thinking, problem solving, [and] reasoning." Id. at 684-85. He testified that "when you start doing damage to the frontal lobes, what you see is behavior that is not in our control." Id. at 685.

According to Gelbort, "[p]eople with frontal lobe problems tend to come of two types: One type you don't see, their [sic] the couch potatoes; they don't have any initiative; they don't do much." Id. The second type, he testified, "are those who have defective inhibition due to frontal lobe deficits. In other words, they act on their impulses rather than saying, no, that's a bad idea, and they get into trouble." Id. He testified that these problems typically present when a person is in their early teens, just as they did with DeRosa. And of these people, he testified, those who do not receive treatment in their teens, "you see that they have trouble getting along in life. Fortunately, it's not typically criminal activity, but you see people who have trouble in their jobs, people who have trouble in their marriages, trouble in their interpersonal relationships because they're impulsive, they act without thinking, they do things that are poorly modulated." Id. at 686-87.

31

Gelbort testified that "[t]hese are not things that, at this point in medical science, we know how to fix. We do have the ability to tone them down" using things like anti-seizure medication. Id. at 688. Finally, Gelbort testified, "I think it's a real shame that he [DeRosa] didn't get the treatment [when he was a teenager] such that none of us would be here today." Id. at 691.

On cross-examination, Gelbort testified that DeRosa was suffering from what he described as an "acquired brain injury" resulting from a lack of development. Id. at 694. Gelbort also explained that emotionally charged situations tend to exacerbate or make the condition worse, particularly when things are happening fast. He stated, "I don't see, in these cases with defective frontal lobes, that these people are necessarily making choices. It's more like the impulse – everybody has impulses going through them all the time." Id. at 698.

*Mitigating evidence that allegedly should have been presented:*

Having summarized the evidence actually presented at the sentencing phase of trial by DeRosa's trial counsel, we turn next to the additional evidence that DeRosa asserts should have presented:

*Letter from Connie Naydan Carroll.* Most notably, DeRosa contends that his trial counsel should have presented a seven-page letter that his maternal grandmother, Connie Naydan Carroll, wrote to the Commonwealth of Massachusetts Family Court on April 21, 1981. The letter, DeRosa asserts, was written in support of a request made by DeRosa's biological father, Money, to

32

change a custody order entered by a Texas state court following the 1977 divorce of DeRosa's biological parents (i.e., Money and Cassie). According to DeRosa, the following passages are the most quote-worthy:

> It is my firm conviction that Cassie is emotionally unstable and morally unfit to retain custody of [DeRosa] or to be responsible for his upbringing. This is also the conviction of Cassie's father, two brothers, and grandparents on both sides. It is also the conviction of her own friends and associates who have known Cassie for that last several years. This conviction is based on the pattern that Cassie has followed since the age of 16, and the pattern has progressively grown worse and with more serious consequences as time passes.

ROA, Vol. 1, Part 2 at 210.

> [U]pon being told by her ex-husband [her first husband, Jerry Friedel] that he was going to remarry, [Cassie] went to the house he was renting, and set fire to it in four separate places. Cassie was then called in by the fire marshall [sic] of Irving, Texas and questioned. I am sorry now to say that I supplied her with an alibi, hoping she would be frightened enough to change her lifestyle. I also consulted with our family doctor and attorney about the possibility of having Cassie committed for observation. Cassie's reaction to the possibility of her having a mental problem [wa]s very hostile. Unfortunately, we did not pursue this course.

Id. at 211.

> I apologize for the length of this statement, but I feel it is necessary for Cassie's past to be known, because the only change she has made in eleven years is to become more antisocial. My daughter is a sociopath in every sense of the disorder, and an enemy of society. In my opinion, she is dangerous, and she will seek revenge against any person whom she feels has wronged her. She has absolutely no conscience and her behavior is impulsive and irresponsible and often places her in dangerous situations. She has a total rejection of authority and disregard of consequences of her actions, whether affecting her or someone else. She is a compulsive liar and has been from her youngest years. She has a very over-exaggerated sense of

33

importance and will stop at nothing to be the center of attention or VIP.  She will use anyone for whatever they can offer to help her gain her own goal.  Anything she wants to do is made acceptable (in her own eyes) just by the simple fact that she wants to do it, but then she is never to blame for the results.  She prostitutes herself when necessary to gain her goal, but in her mind, nothing she has ever done was wrong.  And the worst part is that she can put up such a good front that she could fake her way right past an examining psychologist unless he were experienced and had time for complete observation.  This was told me by our family doctor and attorney when I consulted them after the arson act.

Id. at 213.

[Cassie] is, in my opinion and the opinion of her entire family, totally incapable of providing emotional, physical, mental, or financial security for [DeRosa].  And even more important, Cassie has the most destructive influence on both children that can be imagined . . . she will destroy them as functional beings.

Id. at 213-14.

I have no degree in psychology, but due to the years of problems presented by Cassie, I have studied intensively the subject of abnormal psychology.  I deeply regret to say that Cassie's behaviour [sic] pattern follows exactly that of a full-fledged sociopath, fitting every characteristic and missing none.  My mother (Cassie's grandmother) has a Master's degree in Guidance and Counceling [sic], agrees fully.

Id. at 214.

*Jerry Friedel.*  Friedel was Cassie's first husband and the father of Jason.

Friedel, in an affidavit, alleged that Cassie intentionally set fire to a house he was

renting following their divorce.

*Michael Naydan.*  Naydan is Cassie's younger brother and DeRosa's uncle.

In an affidavit submitted with DeRosa's habeas petition, Naydan alleged that

34

"[g]rowing up with . . . Cassie was pure hell" and that "it was always very clear that Cassie had a major screw loose." Id. at 231. Naydan characterized Cassie as "a troublemaker," "a bully," and promiscuous. Id. Naydan alleged that "Cassie set fire to [Friedel's] house," and that "[a]fter the arson, [their] parents tried to get her checked into a mental hospital for some professional help, but the doctors said it had to be voluntary." Id. at 232. Naydan asserted that Cassie was an unfit mother and gave examples to support his assertion. Ultimately, Naydan alleged: "My sister is as nutty as they come and has always been a pathological liar. Cassie was not only an unfit mother, but she should never have been trusted to care for a child with special needs like [DeRosa]." Id. at 235.

*Connie Carroll*. Connie, as noted, was Cassie's mother and DeRosa's maternal grandmother. In an affidavit submitted with DeRosa's federal habeas petition, Connie reiterated much of the information that was contained in her 1981 letter to the Massachusetts family court. She further stated that "[o]ccasionally Cassie would seem to have her act together and [she] would let the boys [Jason and DeRosa] go with her." Id. at 238. Connie further stated that Cassie had the boys "when she was living in Lawton, Oklahoma for awhile but then she went on assignment for the military and abandoned them at a day care center." Id. According to Connie, "Cassie got a substantial insurance settlement from [DeRosa Sr.'s] death," but "didn't use any of it for the [psychological] treatment that [DeRosa] needed." Id. at 240.

35

*Jason DeRosa.* Although Jason, DeRosa's older half-brother, actually testified as a mitigation witness on DeRosa's behalf, DeRosa now contends that Jason could have provided additional mitigating testimony. In particular, DeRosa asserts, Jason could have testified about specific examples of Cassie's "alcoholism, paranoia, hoarding, and other symptoms of mental illness." Aplt. Br. at 20. DeRosa also asserts that Jason could have testified that "there were huge verbal conflicts between [Cassie] and [Connie] and one time there was even a car chase when [Connie] was chasing [Cassie] to a police station." ROA, Vol. 1, Part 2 at 243.

*James Money.* Money, DeRosa's biological father, prepared an affidavit that was submitted with DeRosa's federal habeas petition. Money described his experiences in the Vietnam war and the impact it had on the rest of his life, including causing him to drink excessively. Money also described meeting and marrying Cassie. He stated that "[s]he would lie all the time to get out of sticky situations," "blamed everyone else, especially her mother, for all of her troubles," and "started fooling around behind [his] back." Id. at 248. Money confirmed that DeRosa lived with him and his current wife, Vicki, from the age of six until the age of eleven or twelve. He stated that after Cassie married DeRosa Sr., he agreed to let DeRosa live with Cassie and DeRosa Sr. "because [he] knew how close Jason and [DeRosa] were." Id. at 249. "That," he stated, "[was] the last time [he] ever saw [DeRosa]." Id.

36

*Gunhilt Money*.  Gunhilt Money was Money's first wife, and Money divorced her to marry Cassie.  Attached to DeRosa's federal habeas petition was an affidavit from Gunhilt that detailed her history with Money.  She alleged that his experience in Vietnam "changed [him] into a totally different person," and "[he] . . . developed a very serious drinking problem and . . . seemed angry all the time."  Id. at 259.  She alleged "[he] was physically abusive to [their] children, and had no patience whatsoever."  Id.  Gunhilt alleged that she divorced Money in 1974, after Money began having an affair with Cassie, and that Money "never sent [her] a dime in child support."  Id. at 260.  In approximately 1980, Gunhilt alleged, she received a phone call "from Cassie's mother, Connie, who told [her] that Cassie had abandoned her children and [Connie] had rescued them from a day care center in Oklahoma," and Connie "needed to know how to reach [Money] so he could take custody of" DeRosa.  Id.  She alleged that Money "came back to Dallas to get [DeRosa] and . . . was arrested for non-payment of child support." Id. at 261.  "When [Money] got out of jail," she alleged, they "attempted a reunion," and Money and DeRosa "came to live with [her] and [her] children." Id.  "Even though [DeRosa] was three years old," she alleged, "no one had ever toilet trained the poor child, so he was still in diapers."  Id.  She alleged that DeRosa "seemed like a child who had always been sadly neglected and was in desperate need of love and caring."  Id.  According to Gunhilt, her reunion with Money "was very short-lived," and "[s]oon thereafter, he moved back to Boston

37

with [DeRosa]." Id. She alleged that "[w]hen [DeRosa] was about 6 years old, [Money] moved back to Dallas and married a woman named Vicki." Id. She "would see [Money] occasionally," she alleged, "because [her] children would visit [Money's] home." Id. She alleged that she and Money "would sometimes discuss the need for [DeRosa] to get some special testing or treatment, because he seemed like a child who had some problems." Id.

*Donna M. Schwartz-Watts, M.D.* Schwartz-Watts (Schwartz) is a board-certified psychiatrist and an associate professor of psychiatry and director of forensic services at the University of South Carolina School of Medicine in the Department of Neuropsychiatry. Schwartz examined various documents from this case and "opin[ed] with a reasonable degree of medical certainty that . . . DeRosa is pre-disposed to mental illness" and she concluded "[t]here [we]re indications of sexual abuse as a child including his history of eneuresis (bedwetting) and especially encopresis (soiling self)." Id. at 264. She also concluded "[t]here [we]re indications that . . . DeRosa suffered from symptoms consistent with Attention Deficit Hyperactivity Disorder during childhood." Id. "There [we]re indications" in the materials, she alleged, "that . . . DeRosa's mother was very negligent and abusive and may have mental illness." Id. In particular, Schwartz alleged, DeRosa's mother "manifest[ed] symptoms that could be consistent with a mood disorder, known as bipolar affective disorder . . . and likely an underlying personality disorder." Id.

38

*Vicki Money*.  Vicki married Money in 1983.  At that time, Money had

custody of DeRosa, and DeRosa began living with Money and Vicki.  Vicki

alleged that "[i]t was always [her] understanding from both [Money] and Connie

that [DeRosa's] mother, Cassie, was unstable and unfit to care for her children."

Id. at 267.  Vicki further alleged that DeRosa "had problems with frequent

bedwetting" and "would [also] often poop his pants."  Id. at 268.  According to

Vicki, DeRosa's "school became concerned that [DeRosa's] problems could be a

symptom of sexual abuse, so they pulled him and [Vicki's adopted son] Tim out

of class and interviewed them about [their] home life."  Id. at 269.  She alleged

she "had counseled [her] son Tim, who had emotional and intellectual deficits,

not to talk in school about [DeRosa's] bedwetting problems," and "told [him] that

what happened in [their] home was private and wasn't anyone else's business."

Id.  "[W]hen Tim told this to the school officials who were investigating [them],"

she alleged, "they thought [the family] w[as] hiding something and the state was

called in to investigate."  Id.  "Tim and [DeRosa] were taken away from [them]

for a short time," she alleged, "until they realized these concerns were

unfounded."  Id.  Vicki alleged that she "was devastated" when Money "told [her]

that Cassie and her new husband were going to take [DeRosa] with them to

Germany."  Id. at 270.

*Ranada Gentry*.  Gentry is, apparently, an investigator employed by

DeRosa's federal habeas counsel.  Gentry interviewed DeRosa's former high

school counselor, Virginia Poe, and DeRosa's former high school track coach, Stan Stone. Poe "stated [DeRosa's] mother was very difficult to work with," "was more strict on him than most other parents," and "had her own mental problems." Id. at 312. "Poe believed that [DeRosa] was a very unhappy child." Id. "Coach Stone recalled [DeRosa] was an excellent track runner . . . and in fact in 1995 . . . won the Oklahoma State Championship in the 3200 meter." Id. at 313. "During the time Coach Stone worked with [DeRosa] he could tell [DeRosa] was a really troubled kid" and "seemed to him to be a child" who had been abused and neglected. Id. "Coach Stone remembered [DeRosa] had a very aggressive and intolerant mother" who "seemed to be pushing him without mercy." Id. According to Stone, DeRosa "was a very effeminate guy and it seemed [that] his mother was pushing him because of this characteristic." Id. at 314. "Coach Stone thought from his observations [that DeRosa's] mother was very unstable." Id. "It was Coach Stone's opinion that this whole thing could have been prevented if [DeRosa] could have been helped." Id.

*Marlene Sharp*. Marlene was, as previously noted, DeRosa's half-sister and testified on DeRosa's behalf at the sentencing trial. In an affidavit submitted with DeRosa's federal habeas petition, Marlene alleged that their father, Money, was "a very heavy drinker," and "was very strict" and "very abusive." Id. at 355.

*Strickland's first prong - deficient performance*

Because DeRosa never presented his ineffective assistance of trial counsel

40

claim to the OCCA, no state evidentiary hearing was held regarding the claim.

Further, the federal district court in this case concluded that DeRosa could not

satisfy Strickland's prejudice prong, and thus did not hold an evidentiary hearing.

Lastly, as respondent correctly notes, DeRosa "has not produced affidavits from

his trial attorneys regarding their [sentencing phase] strategy." Aplee. Br. at 36.

As a result, there is no evidence in the record on appeal detailing the sentencing

phase strategy of DeRosa's trial counsel or any evidence indicating why they did

not present the additional mitigating evidence that DeRosa now points to.

After examining the mitigating evidence that was actually presented by

DeRosa's trial counsel, it is apparent that trial counsel was well aware of most, if

not all, of the significant mitigating events that occurred during DeRosa's life. In

particular, DeRosa's trial counsel was privy to (a) the fact that most of the

significant adults in DeRosa's life, including his mother, were dysfunctional to

one degree or another, (b) the strained, antagonistic relationship between

DeRosa's mother and maternal grandmother, (c) the series of abandonments that

DeRosa was subjected to as a child, including by his mother and biological father,

(d) the fact that DeRosa's mother essentially abandoned DeRosa and his brother

by leaving them in a daycare facility for a month, and the fact that DeRosa's

maternal grandmother retrieved the boys from the daycare center and took

custody of them, (e) the fact that DeRosa was unclear, during the initial years of

his life, who his mother was, (f) the fact that DeRosa's biological father was

41

neglectful and possibly abusive towards DeRosa, (g) the allegations that DeRosa's father molested DeRosa's half-sister, (h) the fact that DeRosa's stepmother, Vicki, physically punished and abused him, (i) the fact that DeRosa displayed inappropriate behaviors as a teenager and, consequently, had to be returned to the United States from Germany and admitted for inpatient psychiatric treatment, (j) the likelihood that DeRosa did not receive adequate inpatient psychiatric treatment upon his return to the United States, and (k) the nature of DeRosa's psychological issues, including in particular his left frontal lobe deficiencies and the resulting impacts on his behavior. DeRosa's trial counsel, in turn, presented this information to the jury through the testimony of the witnesses listed above.

In light of these uncontroverted facts, we are unable to conclude that the failure to present this additional mitigating evidence was an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. As we have outlined, the additional mitigating evidence is, in large part, duplicative of the evidence actually presented by DeRosa's trial counsel. And, to the extent the additional mitigating evidence is not duplicative, it is, in our view, of marginal value. Specifically, the additional, non-duplicative mitigating evidence bore no relevance to the jury's determination of "whether either aggravating circumstance had been proved," Weeks v. Angelone, 528 U.S. 225, 241 (2000) (italics removed

42

from original), nor was it particularly helpful in terms of "provid[ing] a lawful justification for a life sentence," id.

*Strickland's second prong - prejudice*

Even if we were to assume that DeRosa could satisfy the first Strickland prong, we are not persuaded that he was prejudiced by his trial counsel's allegedly deficient performance. In assessing prejudice, we must determine "whether there is a reasonable probability that, absent the errors, the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. "In making this determination, we consider the strength of the State's case, the aggravating circumstances the jury found, the mitigating evidence defense counsel did present, and the additional mitigating evidence the defense might have presented." Neill v. Gibson, 278 F.3d 1044, 1062 (10th Cir. 2001).

At the sentencing phase of trial, the prosecution formally adopted all of the evidence it presented during the guilt phase of trial. The first-stage evidence established in particular that DeRosa was the key instigator in the decision to rob the Plummers, and was also the person who, in response to Curtis Plummer's request to be allowed to seek help for his critically injured wife, struck him over the head with a marble-top end table and then slit his throat. The first-stage evidence further established that the crime netted DeRosa and his accomplices approximately $73, a portion of which the three spent to buy food at Taco Bell.

43

And, even though DeRosa's stated purpose in committing the robbery was to obtain cash to allow himself and Castleberry to travel to Texas to look for work, in the end the robbery proceeds were insufficient to accomplish this purpose, and DeRosa and Castleberry had to borrow money from Justin Wingo in order to fund their trip. In addition to adopting the first-stage evidence, the prosecution presented victim-impact testimony from Janice Tolbert, the Plummers' only daughter, and Jo Milligan, the sister of Gloria Plummer. Both women read to the jury statements that they had prepared prior to trial.

At the conclusion of the sentencing phase of trial, the jury found that the murders were especially heinous, atrocious, or cruel, and committed for the purpose of avoiding or preventing a lawful arrest or prosecution. The jury's findings in this regard were supported by overwhelming evidence. With respect to the especially heinous, atrocious, or cruel aggravator, the prosecution's evidence, which included testimony from the medical examiner who performed the autopsies on the Plummers, established that the Plummers' deaths were preceded by a physical and bloody struggle with DeRosa, and later Castleberry, during which both victims were stabbed multiple times. Gloria Plummer, the evidence established, suffered five stab wounds to her back (one of which entered her chest cavity and terminated at the diaphragm, a second that entered her left lung, and a third that went into the right lobe of her liver), one stab wound to her front (that also entered her left lung and cut her aorta), and four incised wounds

44

or cuts. One of the incised wounds was a four-inch long wound to her upper neck that passed through her windpipe and transected her left carotid artery and jugular vein. This wound, the medical examiner testified, was caused by either sawing action with a knife or multiple passes in the same area with a knife. Although several of these wounds would have been independently fatal, the medical examiner testified, the evidence established that Gloria was conscious prior to, and likely during, the point in time that Castleberry inflicted the incised wound to her upper neck.

As for Curtis Plummer, the evidence established that he suffered six separate stab wounds, two of which entered his lungs, as well as a seven-inch incised wound to his neck (caused either by multiple separate passes with a knife or a repositioning and a sawing type motion) that transected and passed through his trachea, windpipe, esophagus, carotid arteries, and jugular veins. The evidence also indicated that Curtis suffered a blunt force wound to the left side of his head from the marble-topped end table DeRosa threw on him. Although this blunt force wound may have rendered Curtis unconscious, and thus unaware at the time DeRosa inflicted the lengthy wound to his neck, the evidence was uncontroverted that Curtis was conscious prior to that point, and well aware not only of his own injuries, but also of the serious injuries suffered by Gloria. Indeed, the evidence established that he begged DeRosa and Castleberry to allow him to call 911 to seek assistance for Gloria, and offered them anything he had if

45

they would allow him to get help.

The evidence also overwhelmingly established that the murders were committed for the purpose of avoiding a lawful arrest or prosecution. The prosecution's evidence established that the Plummers knew DeRosa because he had worked for them for a short time in the year prior to their murders. And DeRosa's plan to rob the Plummers capitalized on this familiarity: DeRosa, accompanied by Castleberry, approached the Plummers' home in the late evening and asked Gloria Plummer if they could enter in order to talk to Curtis Plummer about the possibility of work. But, significantly, DeRosa's plan to rob the Plummers did not include any method for avoiding arrest or prosecution, short of murdering the Plummers. Had the Plummers lived, they clearly could have identified DeRosa. Also, after DeRosa and Castleberry left the Plummers' house, they drove to a local lake and disposed of evidence, including the Plummers' truck, their clothing, and the knives, by dumping it into the lake. Lastly, following his arrest, DeRosa told cellmate Daniel Wilson at the LeFlore County Jail "that everything went perfect until Scotty White . . . c[a]me forward" and told the authorities what had happened. Tr., Vol. II at 277.

Having outlined the facts relevant to the prejudice determination, we conclude there is not a reasonable probability that the additional mitigating evidence that DeRosa now points to would have impacted the jury's findings regarding the aggravating circumstances of these murders. Thus, the only way

46

that DeRosa could have been prejudiced by the omission of the additional mitigating evidence is if "there is a reasonable probability that" the presentation of the additional mitigating evidence would have caused the jury to "conclude[] that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.

On this point, DeRosa argues that, "[m]ost prominently, a mountain of deeply disturbing evidence regarding [his] mother Cassie existed but was not presented at trial" and could have altered the jury's sentencing determination. Aplt. Br. at 31. And, he argues, "[t]he mitigating power of Connie Nayden Carroll's letter to the Massachusetts court [wa]s unprecedented and especially strong." Id. In short, he argues, Cassie "was . . . a raging sociopath with an unimaginably destructive effect on [him]," and "[t]his [wa]s a horror story, both biologically and environmentally, that the jury should have heard." Id. at 14.

The problem with DeRosa's arguments is that the jury was well aware, based upon the mitigating evidence actually presented by DeRosa's trial counsel, that Cassie had serious personal issues and was far from a perfect mother. In particular, the jury knew that Cassie effectively abandoned her young sons at a daycare center and then, after her mother took the boys from the daycare center, made no serious attempts to obtain custody of them for several years thereafter. Although the jury may not have been aware of all of the sordid details of Cassie's life, the important point is that, through the testimony of the mitigating witnesses

47

actually presented, the jury was made aware that DeRosa was repeatedly abandoned, rejected, or abused by the important figures in his life, most notably Cassie. In other words, the new evidence that DeRosa now points to regarding Cassie does not "differ in a substantial way . . . from the evidence actually presented at sentencing." Clark v. Mitchell, 425 F.3d 270, 286 (6th Cir. 2005).

Relatedly, although DeRosa now attempts to portray his maternal grandmother as a potentially caring figure who was concerned for his well-being, the great weight of the evidence suggests otherwise. To be sure, it was Connie who retrieved DeRosa and Jason from the Oklahoma daycare center where Cassie had placed them. But Connie did not retain custody of DeRosa for long. Instead, the record indicates that she handed DeRosa over to Money. And there is no indication in the record that DeRosa continued to have any type of contact, let alone relationship, with Connie as an adolescent or young man. In fact, the evidence indicates that, as an adult, he continued to maintain a relationship with Cassie. Finally, and again relatedly, the mitigating evidence actually presented to the jury at sentencing established that, until DeRosa was a teenager and encountered DeRosa Sr., virtually every significant adult figure in DeRosa's life, including Connie, was seriously flawed and either abandoned, rejected, or physically or emotionally abused him.

Nor would the additional mitigating evidence have added anything significant to the jury's understanding of DeRosa's mental deficiencies. As this

48

court has previously stated, a jury "may decide not to impose the death penalty because mental illness helps to explain why the defendant behaved the way he did and makes the defendant less culpable for his crimes," or "they may decide not to impose the death penalty because mental illness makes the defendant a more humanized, sympathetic figure." Wilson, 536 F.3d at 1144. But DeRosa "has not shown a reasonable probability that the additional evidence he offers would have changed the jury's balance of aggravating and mitigating circumstances under either [of these] approach[es]." Id.

In sum, the mitigating evidence actually presented by DeRosa's trial counsel did not "le[ave] the jury with a 'pitifully incomplete' picture of the defendant." Id. at 1146 (quoting Anderson, 476 F.3d at 1148). Instead, it gave the jury a relatively complete, albeit summarized, look at DeRosa's background and mental issues. And, most significantly, we conclude there is not a reasonable probability that the additional mitigating evidence now identified by DeRosa, whether considered individually or as a whole, would have altered the jury's sentencing determination.

*Prosecutorial misconduct*

In Proposition Two of his appellate brief, DeRosa contends that the prosecutor engaged in multiple instances of misconduct throughout the trial that "violated specific constitutional rights and cumulatively infected [his] trial with unfairness in violation of his rights to due process of law and a reliable

49

sentencing hearing." Aplt. Br. at 47 (all capital letters in original). In particular,

DeRosa complains that the prosecutor:

> • misled/vouched to the jury that accomplice/witness Scotty White had no "deal" with the prosecution;
>
> • demeaned DeRosa's right to remain silent and have counsel at questioning;
>
> • personally attacked/accused defense counsel of lying;
>
> • vouched for witness Shawn Ward by arguing that the prosecutors and their investigators had better things to do "than to sit around and trump up cases";
>
> • vouched for a prosecution witness;
>
> • referred to the victims as "Papa" and "Mama Glo" in opening statement, during trial, and in closing argument;
>
> • thanked the jury in closing argument on "behalf of the family" of Papa and Mama Glo; and
>
> • negated critical mitigation evidence through improper argument and insinuation.

Id. at 5-6.

*a) Clearly established federal law*

Prosecutorial misconduct can result in constitutional error in one of two

ways. "First, prosecutorial misconduct can prejudice 'a specific right, such as the

privilege against compulsory self-incrimination, as to amount to a denial of that

right.'" Matthews v. Workman, 577 F.3d 1175, 1186 (10th Cir. 2009) (quoting

Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Second, absent the

50

infringement of a specific constitutional right, prosecutorial misconduct can result in constitutional error if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. In other words, in the habeas context, the petitioner must establish that the prosecutor's misconduct was "of sufficient significance to result in the denial of the [petitioner]'s right to a fair trial." Greer v. Miller, 483 U.S. 756, 765 (1987) (internal quotation marks omitted). In considering whether a habeas petitioner has satisfied this standard, the offending prosecutorial remark or action must be placed in the context of the whole trial, and not viewed in isolation. Id. at 765-66.

DeRosa also cites to three other Supreme Court cases as providing the clearly established federal law applicable to his claims: Caldwell v. Mississippi, 472 U.S. 320 (1985); Gardner v. Florida, 430 U.S. 349 (1977); and Woodson v. North Carolina, 428 U.S. 280 (1976). In Caldwell, the petitioner was convicted of killing the owner of a small grocery store during the course of robbing it. During the second-stage proceedings, petitioner's counsel in large part argued that the jury should show the petitioner mercy in its sentencing decision. In response, the prosecutor "sought to minimize the jury's sense of the importance of its role," "argu[ing] that the defense had done something wholly illegitimate in trying to force the jury to feel a sense of responsibility for its decision." 472 U.S. at 325. In doing so, the prosecutor made the following arguments to the jury:

51

Now, they [the defense] would have you believe that you're going to kill this man and they know – they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable.
\* \* \*
For they know, as I know, and as [the trial judge] has told you, that the decision you render is automatically reviewable by the [Mississippi] Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

Id. at 325-26. After his conviction and sentence were affirmed on direct appeal, the petitioner sought federal habeas relief, arguing that the prosecutor's second-stage arguments led the jury to believe that the responsibility for determining the appropriateness of his death sentence rested not with it but with the state appellate court.

In addressing this issue, the Supreme Court held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-39. The Court noted that "[b]elief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an 'awesome responsibility' has allowed this Court to view sentencer discretion as consistent with–and indeed as indispensable to–the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" Id. at 330 (quoting Woodson, 428 U.S. at 305). Continuing, the Court concluded that "[i]n the capital sentencing context there [we]re specific reasons to fear

52

substantial unreliability as well as bias in favor of death sentences when there [we]re state-induced suggestions that the sentencing jury m[ight] shift its sense of responsibility to an appellate court." Id. at 330. Ultimately, the Court concluded that in Caldwell's case, "the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death," and that it was impossible to "say that this effort had no effect on the sentencing decision . . . ." Id. at 341. Accordingly, the Court vacated the petitioner's sentence and remanded the case for further proceedings. Id.

In Gardner, a capital case, the Supreme Court did not address prosecutorial misconduct, but instead held generally that "[i]t is of vital importance to the defendant [in a capital case] and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." 430 U.S. at 358.

Finally, in Woodson, the Supreme Court struck down as unconstitutional a North Carolina statute that "ma[de] death the mandatory sentence for all persons convicted of first-degree murder." 428 U.S. at 286-87. In doing so, the Court concluded, in pertinent part, that one of the "constitutional shortcoming[s] of the North Carolina statute [wa]s its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." Id. at 303. In other words, the Court held, the statute "accord[ed] no significance to relevant facets of the

character and record of the individual offender or the circumstances of the particular offense," and instead "treat[ed] all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." Id. at 304.

*b) Comments regarding Scotty White*

DeRosa contends that his right to a fair trial was violated when the prosecutor informed the jury during first-stage closing arguments that co-defendant and prosecution witness Scotty White had no "deal" with the prosecution. DeRosa presented this same claim to the OCCA on direct appeal and the OCCA rejected it on the merits:

> DeRosa also challenges certain prosecutorial statements regarding Scotty White. During cross-examination, defense counsel asked White whether he had "a deal," to which White responded, "What do you mean?". White then acknowledged that the original first-degree murder charges against him had been reduced to accessory after the fact, but testified that he had not yet pled guilty and that his attorney was "trying to work a deal" for him. It was clear to everyone at trial that White's assistance and limited involvement in the crime had led to the reduction of his charges and that White was hopeful that his cooperation would be taken into account at his eventual sentencing.

> Nevertheless, DeRosa objects to portions of the following remarks, made during the district attorney's first-stage closing arguments.

> And Scotty was the wheel man, and the defense again is going to say that Scotty White was testifying up here because he's scared to death of what kind of deal he's

54

going to get. Well, he doesn't have a deal. The charge is reduced on him to accessory. He was driving the car. He never went in the house. He's going to get what he's going to get. In a few weeks, maybe a jury like you is going to sit here and tell him what he's going to get. But there's no deal. He's facing up to ninety years in the penitentiary, and yet, he testified, and he testified truthfully to the core elements of the case. Mr. Rowan is going to call him a liar—already has—and he's going to say he took the stand and lied to save his own rear. But the fact is if you look at the statements that Scotty White has given, . . . the core facts about what happened have always been the same.

DeRosa asserts that saying Scotty White "doesn't have a deal" was misleading and amounted to improper bolstering, and also objects to the suggestion that White's charges were reduced because of his limited involvement.

This Court finds nothing improper in the prosecutor's statement that White "doesn't have a deal." The fact that White did not have a plea deal at the time of trial, though he admittedly hoped to make one, was apparently true, and it was appropriate for the prosecutor to note this fact. The suggestion that White's charges were reduced due, at least in part, to his limited involvement was likewise accurate and not misleading. Furthermore, the fact that White had cooperated and was testifying in the hope that it would help reduce his ultimate criminal liability was clear to everyone and was not "obscured" by the prosecutor's remarks. There was no prosecutorial misconduct here.

DeRosa I, 89 P.3d at 1148 (internal paragraph numbers and footnotes omitted).

In this federal habeas appeal, DeRosa asserts that he "has rebutted by clear and convincing evidence the OCCA's conclusion there 'apparently' was no deal with White at the time of trial." Aplt. Br. at 51. According to DeRosa, the prosecutor "knew there was a deal" and he in fact "reduced White's charges to

accessory after-the-fact prior to . . . DeRosa's preliminary hearing despite the fact White's admitted actions clearly made him responsible for the murders as a principal." Id. DeRosa argues that "[w]hen [the prosecutor] argued 'there's no deal,' he knew White had kept his agreement to testify against . . . DeRosa," and "also knew he had, at least tacitly, agreed to reward White with a favorable recommendation as to his sentence." Id. Lastly, DeRosa asserts, "[o]n January 14, 2002, less than two months after . . . DeRosa was sentenced, White pled guilty to the two accessory charges and was sentenced to two concurrent 25 years [sic] sentences, with the last 7 years of each sentence suspended," and the prosecutor "signed off on White's plea agreement." Id. at 50.

Contrary to DeRosa's assertions, he has not rebutted by clear and convincing evidence the OCCA's finding that there was no evidence of a deal between White and the prosecutor at the time of trial. To be sure, it was uncontroverted that the prosecutor reduced White's charges prior to DeRosa's trial. But the reasons for doing so appear clear: the substantial, if not overwhelming, evidence established that White merely acted as a driver for DeRosa and Castleberry. Further, although White may have, at the time of trial, been hopeful of receiving a favorable deal with the prosecutor, there is simply no evidence that a deal existed at the time of trial. See United States v. Molina, 75 F.3d 600, 602 (10th Cir. 1996) ("The mere fact that . . . witnesses were subsequently allowed to plead on favorable terms is not evidence that plea

56

agreements were secretly reached prior to the witnesses' testimony and improperly withheld from the defense."). Instead, the evidence indicates only that White, with the prosecutor's agreement, pled guilty to the accessory charges at some point after DeRosa's trial. Moreover, as the OCCA noted, DeRosa's trial counsel was able to cross-examine White at trial about his hope for a favorable deal, and thereby placed White's credibility at issue before the jury. Notably, however, White's testimony was corroborated by a substantial amount of other evidence, including the testimony of Castleberry.

Thus, in sum, the OCCA reasonably concluded that the prosecutor did not engage in misconduct in denying the existence of a deal with White.

*c) Demeaning DeRosa's right to remain silent*

DeRosa next contends that the prosecutor, in questioning witnesses Kendall Ballew, the former LeFlore County Sheriff, and Shawn Ward, an investigator employed by the Leflore County District Attorney's office, "impermissibl[y] . . . denigrat[ed] . . . DeRosa's right to remain silent." Aplt. Br. at 56. Ballew and Ward were the two law enforcement officers who traveled to Corpus Christi, Texas, to take Castleberry and DeRosa into custody. The prosecutor asked Ballew whether he talked to Castleberry upon taking him into custody, and Ballew testified that Castleberry made a statement to him. The prosecutor in turn elicited testimony from Ward that Castleberry gave consent to search his vehicle (i.e., the vehicle that he and DeRosa drove to Corpus Christi), and that

57

Castleberry subsequently pled guilty to two counts of murder. DeRosa complains that the prosecutor in first-stage closing arguments in turn made the following remarks that, he asserts, indirectly criticized DeRosa's decision to remain silent:

> Well, the defense has made great hay and will continue to make great hay with who actually puts the defendant [DeRosa] in the [Plummers'] house. Well, Mr. Castleberry testified, putting the defendant in the house, putting a knife in his hand and causing the initial stab wounds on both of the victims. And yet, the defense would have you believe that he is doing that simply because he has reached a plea agreement with the State. That the only reason that he took the stand to testify was to save his own life. That's what they're going to tell you, but you need to remember a very important fact, and that's the last fact you heard before we closed our evidence yesterday, and that is that Mr. Castleberry made a statement about what happened in the Plummer's household to Sheriff Kendall Ballew in Corpus Christi, Texas, on the day he was arrested; the day after the charges were filed and the warrant's [sic] issued for his arrest. Before he ever had an opportunity to talk to anybody who could have reached a plea agreement with them, he gave the same core statement that he testified to. So if his motivation to give that statement is that he's saving his life with a plea agreement, those two things just don't fit. He made that statement because his conscience required him to. He made that statement because he knew he was had. He made that statement because it was the right thing to do, and he's not going home. He's already pled guilty. He's done the right thing.

Tr. at 531-32.[4]

DeRosa presented this claim to the OCCA on direct appeal. The OCCA rejected it, stating:

> DeRosa also complains about a number of closing-argument

---

[4] DeRosa's defense counsel did not lodge a contemporaneous objection to these comments.

58

prosecutorial remarks, including a particular characterization of Castleberry's confession to police, just after he was arrested.  The substance of this confession was brought out through the testimony of Sheriff Kendall Ballew, who arrested Castleberry.FN114  * * * DeRosa argues that the prosecutor "went too far with this argument," because by describing Castleberry's actions as "the right thing to do," he was inviting the jury to draw a negative inference about DeRosa's constitutionally-protected decisions to remain silent and go to trial.

> FN114. Castleberry had testified earlier in the trial and been cross-examined about the timing of and rationale for his coming forward.  Although DeRosa objected to Ballew's confession testimony at trial, he now acknowledges that it was appropriate to allow this testimony, to rebut defense counsel's implied accusation of recent fabrication and/or improper motive.

Since DeRosa did not object to this remark, all but plain error has been waived. [footnote omitted]  The reference to Castleberry doing "the right thing" came up within a list of reasons that the district attorney offered as possible rationales for his decision to confess.  No evidence was offered regarding Castleberry's actual reasons; and the jury would most likely have understood the prosecutor's remarks as merely hypothesizing about why an individual who fled the State, after participating in two murders, would confess a few days later.

Directly contrasting one individual's decision to confess and plead guilty with that of a defendant who chooses to remain silent and go to trial—particularly if the first decision is described as "the right thing to do"—could constitute an undue burdening of a defendant's Fifth and Sixth Amendment rights.  That is not, however, what happened in this case.FN116  While prosecutors must guard against remarks that could unduly burden a defendant's exercise of constitutional rights, appellate courts must evaluate prosecutorial remarks within the specific context within which they arise, and not presume that a prosecutor intends—or that a jury will comprehend—an oblique but inappropriate interpretation, rather than a more direct, lawful one.FN117  This Court finds that the district attorney's remarks did not burden DeRosa's exercise of his

59

constitutional rights; nor did the remarks violate due process.

> FN116. The prosecutor did not suggest that Castleberry's choices should be compared with those of DeRosa in this regard. And the current case is totally unlike Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), in which the trial court instructed the jury that it could infer guilt from the defendant's decision to remain silent, under conditions where it could reasonably be expected that an innocent person would speak up, and in which the prosecutor argued to the jury that it should do so in the case at issue. Id. at 609–15, 85 S.Ct. at 1230–33.

> FN117. See DeChristoforo, 416 U.S. at 647, 94 S.Ct. at 1873 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."). While the suggestion that the prosecutor's remarks served as an indirect criticism of DeRosa's failure to confess and plead guilty is interesting and thought-provoking, this interpretation is not the most natural one—which probably explains why no one on DeRosa's defense team, which included current appellate counsel, objected at the time.

DeRosa I, 89 P.3d at 1147-48 (internal paragraph numbers omitted).

In this federal habeas appeal, DeRosa argues that the OCCA unreasonably concluded that the prosecutor's remarks did not burden the exercise of his constitutional right to remain silent. He argues that, because "[t]here were two murder suspects presented to the jury, one who made use of his Fifth Amendment rights, and one who waived his Fifth Amendment rights," "[t]he obvious and clear implication [of the prosecutor's remarks] is that if Castleberry's confession and

60

guilty plea were the right thing, then Derosa's invocation of his constitutional rights was the wrong thing." Aplt. Br. at 58.

We conclude, however, that the OCCA reasonably applied the principle outlined by the Supreme Court in Donnelly, i.e., that a reviewing "court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." 416 U.S. at 647. Although DeRosa asserts that the prosecutor's remarks in his case were not ambiguous, we disagree. The prosecutor's remarks, considered as a whole, were clearly intended to rebut the assertion by DeRosa's defense counsel that Castleberry had, in exchange for a plea deal with the prosecution, provided false testimony about DeRosa's involvement in the robbery and murders. And although the prosecutor's specific remarks about Castleberry doing "the right thing" perhaps could be interpreted as a comment on DeRosa's silence, the more natural and reasonable interpretation, as the OCCA effectively concluded, is that the prosecutor was simply asserting that Castleberry was following his conscience and telling the truth about what had happened.[5]

*d) Attacking/accusing defense counsel of lying*

---

[5] Even if we were to conclude that the prosecutor's remarks were intended as an improper comment on DeRosa's decision to remain silent, the resulting error was harmless, given the substantial evidence of DeRosa's guilt.

61

DeRosa contends that "[d]uring the presentation of witnesses and in closing argument, the prosecutor tainted the jury and imposed his personal view of the evidence by unfairly attacking defense counsel and accusing him of lying." Aplt. Br. at 60.

DeRosa raised this same claim on direct appeal. The OCCA outlined the background facts relevant to the claim before rejecting the claim on the merits:

> The challenged remark, which was actually a question, must be understood within the context in which it arose. Daniel Wilson, who shared a cell with DeRosa in the LeFlore County Jail during October of 2000, testified for the State as a "jailhouse informant."[FN83] He testified that although DeRosa did not initially talk about what he had done, he eventually "started coming out with more and more of it," to both Wilson and another cellmate.
>
>> FN83. On cross-examination, Wilson testified that he and DeRosa shared a cell together for part of September of 2000, though DeRosa was not even arrested until October 4, 2000.
>
> Most of the story that Wilson ascribed to DeRosa was consistent with the testimony of Castleberry and White.[FN84] According to this story, DeRosa planned the crime, and he and Castleberry entered the home after Mrs. Plummer came to the door. After they were inside, they began "demanding the money and stuff." DeRosa held a knife to Mr. Plummer, while Castleberry held a knife to Mrs. Plummer. Everything was going according to plan, until Mrs. Plummer "started rebelling" and "fighting back." Castleberry then started stabbing her; and when Mr. Plummer tried to come forward and help his wife, DeRosa "went ahead and done what he had to do."[FN85]
>
>> FN84. On appeal, DeRosa correctly points out that parts of Wilson's account are inconsistent with other evidence presented at trial. For example, Wilson's story describes DeRosa as hanging back, while Castleberry initially

62

went to the Plummers' door alone; names Castleberry, instead of DeRosa, as the person who initially stabbed Mrs. Plummer; and refers to both men taking a "shower" afterward. Defense counsel was free to point out these inconsistencies at trial.

FN85. Wilson testified that DeRosa told him that after they killed the Plummers and stole their truck, they met Scotty White and put the truck in the water. Wilson described DeRosa as "real cocky" that no one was going to find any evidence, because they had taken the knives, one of which was a "fold-up knife" and the other of which was a "regular straight knife," put them in a sock, and thrown them into the water, off to the side of the truck. According to Wilson, DeRosa stated that they ate at Taco Bell afterwards, with money taken from the Plummers, and that "everything went perfect" until White came forward.

Defense counsel attempted to establish that Wilson had agreed to testify, and had probably "enhanced" his testimony, in order to obtain a favorable plea bargain on numerous charges he had previously been facing.FN86 Wilson testified that he had not been given and did not expect to receive any special treatment in his own cases, based upon either the information he provided or his testimony against DeRosa. [footnote omitted] In fact, Wilson maintained that he first contacted law enforcement about DeRosa on January 22, 2001, the very day that he entered a plea bargain resolving his three different cases.

FN86. The exhibits entered into evidence at trial indicate that Wilson had previously been facing charges in three separate LeFlore County cases. In CF–2000–147, he was charged with one count of Larceny of a Motor Vehicle, as well as four other counts. Although the original information is not included in the record, Wilson admitted at trial that the four other counts were two counts of Assault and Battery with a Dangerous Weapon, one count of First–Degree Burglary, and one count of Kidnapping. In CF–2000–331, Wilson was charged with one count of Feloniously Pointing a

63

Firearm.  In CF–2000–385, Wilson was charged with a felony count of Running a Road Block, as well as four misdemeanor counts (Eluding a Police Officer, Driving Without a Driver's License, False Report of Theft of a Vehicle, and Obstructing an Officer).  A "second page," alleging a prior felony conviction for Escape From County Jail, was filed in all three cases.  It should be noted, however, that the sole felony count in CF–2000–385 was dismissed at the preliminary hearing in that case, on October 3, 2000—before DeRosa was even arrested.  Hence only four misdemeanor counts were at issue in that case.

On this date Wilson did resolve his three cases in a very favorable manner.FN88  Wilson testified that as he sat in the hallway of the LeFlore County Courthouse, after entering his pleas, he saw Shawn Ward walking down the hall and told Ward that he might have "something that could help" in DeRosa's case and that he knew where the knives were.  Ward, who was the main investigator in the Plummer case, had previously been a police officer and knew Wilson from arresting him in the past.  According to Wilson, Ward asked him why he was in the courthouse and the status of his cases, but did not pursue his offer of information or set up any further meeting.FN89 Wilson testified that he did not have any further contact with Ward until he wrote him a letter, from the Lawton Correctional Facility, on June 14, 2001.FN90

> FN88.  Exhibits admitted into evidence at trial indicate that on January 22, 2001, Wilson pled guilty to Larceny of a Motor Vehicle, in CF–2000–147, and Feloniously Pointing a Firearm, in CF–2000–331.  The four other counts in CF–2000–147 were dismissed; the "second page" was dismissed in both cases; and CF–2000–385, with its four remaining misdemeanor counts, was dismissed entirely.  Pursuant to the plea bargain resolving these cases, Wilson was sentenced, on the two counts upon which he was convicted, to seven years imprisonment, with the first two in DOC custody and the other five suspended, to be run concurrently.  Wilson testified at DeRosa's trial that he believed he had "about fifty-something days" remaining on his incarceration at

that time.

FN89. On re-direct examination, Wilson testified that the written plea agreement, summarizing the deal he had obtained, was completed and signed before he ever saw Ward that January afternoon.

FN90. In the letter, which was admitted as an exhibit at trial, Wilson wrote that he was contacting Ward because he had not heard from him and that he was still available to help if they needed him. The letter also stated, "I still need those dates before I could sit down and state all that right." The letter noted that Wilson had about six months left on his sentence.

Defense counsel cross-examined Wilson vigorously, and often sarcastically, about the numerous serious charges he was facing before his plea bargain; the things he had been accused of doing; the possible lengthy sentences on those charges, particularly in light of his prior conviction; other prior convictions and the effects of drug usage; FN91 the fact that Wilson was represented by the same attorneys who represented Scotty White; the fact that the prosecutor who dismissed the various charges against him was also one of the prosecutors in DeRosa's case; and the fact that Wilson's ultimate sentence was only seven years, with only two in actual custody. Defense counsel openly mocked Wilson's claim that his favorable plea deal was unrelated to his current testimony.FN92 He also suggested that Wilson's request for "dates," in his letter to Ward, was part of a State effort to help Wilson craft his testimony against DeRosa.

FN91. Wilson admitted to drug convictions in California and Arkansas during his testimony.

FN92. Defense counsel asked, "And we're to have it—to understand that you have no deals in this case at all, right?". He also chided that Wilson must have "the world's best attorney."

After the lengthy testimony of Wilson was completed, the State called Shawn Ward to the stand. After going through his

background and qualifications, the district attorney asked, "How often do you commit conspiracies to get people thrown in the penitentiary?". Defense counsel immediately objected; and at the bench conference that followed, the district attorney defended his question by asserting that defense counsel had spent "the last half hour" suggesting that there was a conspiracy between his office and Daniel Wilson.FN93 The court ultimately found that the State was entitled to put on evidence to rebut the defense inference that there was a plea agreement, but that the word "conspiracy" was too argumentative.

> FN93. Defense counsel responded to the district attorney's assertion that he had implied there was a conspiracy, saying, "Well, I didn't say it though." A heated exchange between the two attorneys followed, in which the court had to remind them to address the court and not each other.

Ward then testified about the circumstances surrounding his conversation with Daniel Wilson on January 22, 2001.FN94 Ward flatly denied that he intervened in any way to influence Wilson's plea bargain or his sentence. Ward noted that he saw Wilson in the courtroom hallway again some time later, on the day Wilson was there for sentencing. Ward testified that Wilson said DeRosa was being "very open with him," but that Wilson wanted Ward to find out the date that another inmate left the LeFlore County Jail, and that the "dates" mentioned in Wilson's letter was really just a reference to this request.FN95

> FN94. Ward testified that he did talk to Wilson that afternoon and that Wilson said he was in court settling some charges. Ward testified that although Wilson claimed to have information regarding DeRosa, Ward told him that he did not want to talk to him until Wilson had settled his own cases.

> FN95. Ward testified that Wilson told him that DeRosa did not start opening up until after inmate J.R. Green was gone. Wilson had earlier testified that DeRosa was afraid of Green.

66

The district attorney's questioning of Ward that immediately followed is the subject of DeRosa's claim on appeal.

Q. So this letter that you got from him refers to dates was where you provided the specific dates of this crime so Daniel could make up his story?

A. No.

Q. In fact, the date was the day that Glover Green left for LARC?

A. That's exactly the date I provided him.

Q. So the questions we heard Mr. Rowan ask a while ago are not true?

A. No, sir; they are not.

Q. So it's a good questions [sic] who's lying in that—

At that point defense counsel objected, sought a bench conference, and moved for a mistrial. The trial court, without a bench conference, immediately sustained the objection and admonished the jury "to disregard the last statement by the D.A." The court then overruled the defense motion for a mistrial.

DeRosa acknowledges the general rule in Oklahoma that a jury admonishment to disregard a prejudicial remark cures any error. DeRosa correctly notes, however, that comments by a prosecutor that are "unusually egregious" and "so prejudicial that they would undoubtedly taint the verdict" are an exception to this general rule. [footnote omitted] In such cases, even an admonishment by the trial court could be inadequate to cure the error, and a defendant could be entitled to relief on appeal. In order to determine whether an improper remark or improper testimony rises to this level of prejudice, this Court must evaluate both the improper statement(s) and the evidence presented in the case as a whole. [footnote omitted]

The State's arguments, (1) that the district attorney did not "even present[ ] a complete thought," because the challenged

67

question was interrupted by an objection, and (2) that the district attorney "did not directly call defense counsel a 'liar,'" are not well-taken. While it may be strange to refer to a question as "not true" or to suggest that a person is "lying" due to the way that he or she is asking questions, the clear import of the district attorney's questions was to accuse defense counsel of lying; and DeRosa's jury would have understood this. As such, the district attorney's behavior was clearly improper. [footnote omitted] The prosecutor was entitled to rebut the inference that Wilson's testimony had been influenced by a "secret deal" with the State and to suggest that the jury should not be misled in this regard. He should not, however, have resorted to a personal attack on defense counsel.FN99

> FN99. This Court recognizes that previous and subsequent remarks by defense counsel also crossed the line of appropriate representation, but such remarks did not justify corresponding inappropriate behavior on the part of the State. This Court likewise rejects the State's argument that by asserting a particular theory or defense, "defense counsel put his own credibility at issue."

Nevertheless, this Court is confident that the district attorney's remarks did not influence or taint the verdict in this case. [footnote omitted] Despite defense counsel's suggestions to the contrary, Daniel Wilson's testimony was not critical, or even particularly significant, to the State's case against DeRosa. The core of the State's case was the testimony of the two men with whom DeRosa plotted and accomplished the robbery/murder of Curtis and Gloria Plummer, i.e., Eric Castleberry and Scotty White. The compelling testimony of these men was fundamentally consistent and was corroborated by the physical evidence. DeRosa's conviction was further supported by the testimony of other persons to whom he had made incriminating statements, including Daniel Wilson.FN101 Yet even if Wilson's testimony were entirely eliminated from DeRosa's trial, this Court has no doubt that the result of the trial, both the convictions and the death sentences, would have been the same. DeRosa has not shown that his right to due process, or any other constitutional right, was prejudiced by the district attorney's remarks. Hence his claim is rejected in its entirety.

68

> FN101. These persons include Chris Ford, Officer David Leal, Justin Wingo, and Daniel Wilson.

DeRosa I, 89 P.3d at 1141-45 (internal paragraph numbers omitted).

In this federal habeas appeal, DeRosa argues that "[t]he OCCA's determination that Wilson's testimony was not particularly significant [wa]s an unreasonable determination." Aplt. Br. at 62. "The prosecution," he argues, "clearly characterized Wilson's testimony as critical, so much so it said DeRosa's defense was to 'get rid of Danny Wilson's testimony somehow because Danny Wilson's testimony cooks his . . . goose.'" Id. (quoting Tr. at 552).

A review of the entire trial transcript, however, establishes that DeRosa's arguments are baseless. To be sure, the prosecutor, during first-stage oral arguments, did argue that defense counsel needed "to get rid of Danny Wilson's testimony somehow because Danny Wilson's testimony cooks his client's goose, and the way he's chosen to get rid of it is to say that one of my assistant district attorneys conspired with one of my investigators to get his client." Tr. at 552. But the prosecutor's purpose in doing so was not to assert that Danny Wilson was the prosecution's key witness, but rather simply to counter defense counsel's assertion that there was some type of conspiracy or agreement between Wilson and Ward, whereby Wilson provided false testimony to assist the prosecution. Indeed, as the OCCA reasonably noted in rejecting this claim, it is quite clear from reviewing the trial transcript that Wilson was a relatively minor witness, and

69

that his testimony was by no means crucial. Instead, the key testimony came from Castleberry and White. Thus, as the OCCA concluded, it is clear that the outcome of both the guilt and sentencing phases of trial would have been the same had Wilson not testified.

*e) Vouching for the honesty and credibility of prosecution witnesses*

Related to his claim regarding witness Wilson, DeRosa contends that the prosecutor also engaged in misconduct and violated DeRosa's right to a fair trial by vouching for the credibility of the prosecution's witnesses, including investigator Ward, during first-stage closing arguments. The OCCA rejected this claim on the merits (along with some related claims), stating as follows:

> DeRosa also challenges the following statements by the district attorney, as examples of him asserting his own credibility as a basis for convicting DeRosa: (1) that it "offended" him that defense counsel was calling Shawn Ward a "liar"; (2) that "I promise you one thing: We've got more than enough to do up here than sit around and trump up cases against people in the community"; and (3) that defense counsel's attack on Daniel Wilson's credibility was "a common defense tool" to put everyone on trial but the defendant. All of these remarks were in response to defense counsel's suggestion that Wilson had a "secret deal" with the State, which Ward was dishonestly denying, [footnote omitted] and the broader defense theme that the case against DeRosa was based not on actual guilt, but on the State's desire to "get him," through the bartered testimony of its witnesses.

> Defense counsel objected to the remark about Shawn Ward on the ground that he had not actually called the various witnesses "liars."FN120 We find that any inappropriate suggestion within the remark—such as the prosecutor's personal belief in Ward's credibility—was minimal, and that the remark did not affect the verdicts in DeRosa's case. Objections to the second two statements

70

were sustained, and the jury was admonished to disregard them. DeRosa argues that despite these admonishments, these remarks help establish "a pattern of prosecutorial misconduct that infected appellant's trial with unfairness." DeRosa further argues that even if improper witness testimony and prosecutorial remarks did not affect the guilt-stage verdicts in his trial, they could have affected the jury's decision to sentence him to death.FN121

FN120. Not surprisingly, this objection was overruled.

FN121. DeRosa's only specific complaints regarding the second stage of his trial are the district attorney's reference to Dr. Wanda Draper's "career as a professional witness," and his continuing use of the terms "Papa" and "Mama Glo." The trial court sustained defense counsel's objection to the "professional witness" comment and admonished the jury to disregard it.

This Court has recognized a number of instances of prosecutorial misconduct during DeRosa's trial—including suggesting that defense counsel was "lying" and inappropriately attempting to align the State with the victims—and found that a particular statement by witness Janet Tolbert was improper.FN122 This Court notes that even though some of the district attorney's remarks crossed the line of appropriate representation, many of these remarks were in direct response to defense counsel's own overzealous arguments.FN123 Ultimately, DeRosa has failed to show either that his trial was so infected by misconduct and unfair testimony as to violate due process, or that his death sentences were obtained through a violation of the Eighth Amendment. DeRosa was convicted and sentenced to death based upon the facts of his crime and the aggravating circumstances in the case, rather than any improper remarks by the district attorney or State witnesses. Hence the current claim is rejected.

FN122. In making its ultimate evaluation of the fundamental fairness of DeRosa's trial, this Court has considered all of these circumstances, including the prosecutorial remarks to which objections were sustained and about which the jury was admonished.

71

FN123. See Darden[ v. Wainwright], 477 U.S. [168,] 182 [(1986)] (noting that "[m]uch of the objectionable content" within the prosecutor's argument "was invited by or was responsive to" defense counsel's earlier argument).

DeRosa I, 89 P.3d at 1148-49 (internal paragraph numbers omitted).

DeRosa complains that "[t]he OCCA did not employ the Chapman [harmless-beyond-a-reasonable-doubt] standard" in assessing the harmlessness of the prosecutor's comments, and thus "its determination was unreasonable." Aplt. Br. at 68. But even assuming that the OCCA did err in this regard, we are bound to apply "the more forgiving standard of review" outlined in Brecht v. Abrahamson, 507 U.S. 619 (1993), under which an error is deemed harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict," Fry v. Pliler, 551 U.S. 112, 116 (2007) (internal quotation marks omitted). And we conclude, having reviewed the trial transcript, that the prosecutor's statements did not have a substantial and injurious effect or influence in determining the jury's verdict. Rather, the jury's first-stage verdict was amply, if not overwhelmingly, supported by the prosecution's evidence. And we conclude the same holds true for the jury's second-stage sentencing verdict.

*f) Referring to victims as "Papa" and "Mama Glo"*

DeRosa contends the prosecutor violated his right to a fair trial by repeatedly referring to the victims as "Papa" and "Mama Glo," rather than using their real names. Relatedly, DeRosa contends the prosecutor acted improperly

72

and violated DeRosa's right to a fair trial during closing arguments by thanking the jury on behalf of the victims' family. According to DeRosa, these actions by the prosecutor "encouraged the jurors to develop improper sympathy for the victims." Aplt. Br. at 72.

DeRosa asserted this same claim on direct appeal. The OCCA rejected it, stating as follows:

> The district attorney repeatedly referred to the victims as "Papa" and "Mama Glo."FN107 Defense counsel objected to the use of these terms of endearment during the testimony of the State's first witness, Roger Murray (the ranch hand who discovered the Plummer bodies).FN108 During a bench conference, defense counsel objected to the prosecutor's use of the nicknames and asked that the victims be referred to by their actual names. The objection was overruled by the trial court without comment; and the district attorney continued referring to "Papa" and "Mama Glo" throughout his questioning of Murray, as well as during his closing arguments for both stages of DeRosa's trial.FN109
>
>> FN107. The other two prosecutors who participated in the trial referred to the victims by their more formal, given names.
>>
>> FN108. Murray referred to Curtis Plummer as "Papa" and referred to Gloria Plummer as "Mama Glo."
>>
>> FN109. Gloria Plummer's sister, Jo Milligan, was the only other witness who ever referred to "Papa" and "Mama Glo," and she did so only one time, during the second stage of trial. Milligan also called the victims "Curt" and "Glo." Janet Tolbert, the Plummers' only child, consistently referred to her parents as "mother" and "daddy." Hence the State's argument that the victims were generally referred to as "Papa" and "Mama Glo" is not supported by the record, nor is the argument that the district attorney used these nicknames merely to make

73

its first witness more comfortable, since he began using the familial names in the first lines of his opening statement.

DeRosa characterizes the district attorney's use of these familiar names as an improper attempt to align himself with the victims. DeRosa notes that the district attorney also thanked the jury "on behalf of the victims."[FN110] This Court finds that the district attorney did improperly seek to align himself with the victims and that the trial court erred by overruling DeRosa's objection to this attempt.[FN111] We do not conclude, however, that the trial court's ruling amounted to an abuse of discretion or that the prosecutor's actions had any effect upon the verdicts. DeRosa was found guilty and sentenced to death based upon the overwhelming and properly admitted evidence in the case. Within the context of the entire trial, the prosecutor's actions were not so prejudicial that they rendered DeRosa's trial fundamentally unfair or his death sentence unreliable.

> [FN110]. During his guilt-stage closing argument, the district attorney stated, "Now, on behalf of the family and the State of Oklahoma, I want to say thank you for your jury service."

> [FN111]. See Tobler v. State, 1984 OK CR 90, 688 P.2d 350, 356. Standing alone, the prosecutor's "thank you" statement was not significant in this regard—nor was it objected to—though it did add to the potential harm from the use of the familial references.

DeRosa I, 89 P.3d at 1146 (internal paragraph numbers omitted).

We conclude, after reviewing the trial transcript, that the OCCA's harmless error analysis was reasonable. And although DeRosa asserts in this appeal that the prosecutor's comments specifically violated his Eighth Amendment right to a fair and reliable sentencing proceeding, the transcript of the sentencing proceeding clearly indicates otherwise. Unlike in Caldwell, the prosecutor's

74

comments did not result in the jury "believ[ing] that the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere." 472 U.S. at 328-39. Nor did the prosecutor's comments appear to impact the reliability of the jury's second-stage verdict. Finally, and relatedly, the prosecutor's comments were not significant enough to cause the jury to base its second-stage verdict on "caprice or emotion," rather than "reason." Gardner, 430 U.S. at 358. In other words, the comments were harmless because they did not have a "substantial and injurious effect or influence in determining the jury's verdict." Fry, 551 U.S. at 116 (internal quotation marks omitted).

*g) Questions/comments designed to limit consideration of mitigating evidence*

DeRosa contends the prosecutor violated his Eighth and Fourteenth Amendment rights by asking questions of potential jurors during voir dire "designed to educate [them] that evidence that did not reduce guilt or moral culpability was not to be considered by them." Aplt. Br. at 78. "The types of mitigating evidence dismissed in this questioning," he asserts, "included classic kinds of mitigating evidence: family history, bad childhood, lack of brain function, lack of capacity." Id. DeRosa argues that the prosecutor then "continued this theme in [second-stage] closing argument" by asserting that DeRosa would claim the crimes were the fault of others, including his parents, the daycare center, his grandmother, and the military. Id.

75

The problem for DeRosa is that he never presented these arguments to the Oklahoma state courts. To be sure, in his application for post-conviction relief, DeRosa argued that his trial counsel was ineffective for failing to object to the district attorney's purported efforts, during voir dire and at second-stage closing arguments, to unconstitutionally limit DeRosa's mitigating evidence (the OCCA declined to review this claim, concluding it was procedurally barred due to DeRosa's failure to assert it on direct appeal). But at no time has DeRosa ever directly brought the purported prosecutorial misconduct to the OCCA's attention; he did not, for example, include it in his direct appeal brief, even though he argued other examples of purported prosecutorial misconduct.

Were DeRosa to now attempt to return to the OCCA and file a second application for post-conviction relief raising the claim, it would clearly be procedurally barred. The applicable rule of the OCCA provides that "a second application for post-conviction relief must be filed within sixty days from the date a previously unavailable factual basis for an application is discovered." Smith v. State, 245 P.3d 1233, 1238 (Okla. Crim. App. 2010) (citing Rule 9.7(G)(3), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2010)). Because DeRosa was obviously aware of the factual basis for the claim at the time he filed his initial application for post-conviction relief, he is now well outside the sixty-day window afforded by the OCCA's rule and thus would be procedurally barred from filing a second application for post-conviction relief

76

based upon this claim of prosecutorial misconduct.

And DeRosa has made no attempt to overcome this anticipatory procedural bar to federal habeas review. As we have noted, DeRosa cannot make a credible claim of actual innocence, and thus cannot rely on the "fundamental miscarriage of justice" exception to procedural bar. Coleman, 501 U.S. at 750. Further, DeRosa has made no attempt to argue cause and prejudice, i.e., that his appellate or post-conviction counsel was ineffective for failing to raise the claim.[6] Thus, the claim is procedurally barred.

*h) Cumulative prosecutorial misconduct*

Finally, DeRosa argues that the various instances of prosecutorial misconduct cited in his brief, considered cumulatively, created fundamental unfairness at both stages of his trial. The OCCA concluded that the allegations of prosecutorial misconduct (save for the last claim, which, as we have noted, was never raised in state court), considered together with the alleged introduction of improper victim-impact evidence, did not result in fundamental unfairness.

In our view, this conclusion is entirely reasonable. As we have explained, the evidence of DeRosa's guilt was extremely strong, if not overwhelming.

---

[6] Even if DeRosa could overcome the anticipatory procedural bar, we would reject the claim on the merits. In particular, considering all of the evidence presented at trial, as well as the instructions given by the state trial court to the jury, DeRosa was not prejudiced by the prosecutor's purported attempt to limit the mitigating evidence.

77

Likewise, the aggravating factors found by the jury were amply supported by the evidence. Considering the evidence and trial proceedings as a whole, we conclude that the jury was able to judge the evidence fairly, notwithstanding the various instances of prosecutorial misconduct alleged by DeRosa. We in turn conclude, therefore, that neither stage of trial was rendered fundamentally unfair by the cumulative effect of the alleged misconduct.

*Victim-impact testimony*

In Proposition Three of his appellate brief, DeRosa contends that the introduction at his trial of improper victim-impact evidence violated his rights under the Eighth Amendment. In support, DeRosa first asserts that "[u]nofficial victim[-]impact evidence was presented . . . *in the guilt phase of trial,*" Aplt. Br. at 82 (italics in original), when Janet Tolbert, the Plummers' only daughter, testified. "In response to a simple request to point to suspect DeRosa in the courtroom and identify him by his appearance," DeRosa asserts, "Tolbert angrily lost control and lashed out emotionally against him," id. at 83. Specifically, the following exchange occurred between the prosecutor and Tolbert:

Q. Could you point to him and describe how he appears to you today?

A. You really don't want me to say that, and I'd be thrown out of here. I'm sorry.

Q. Well, I'm asking you –

[DEFENSE COUNSEL]: Judge, may I approach the bench?

78

THE COURT: Yes.

[DEFENSE COUNSEL]: Judge, these prosecutors know full well what this witness is going to say when she took the stand and had to identify Mr. DeRosa. This outburst may have been prevented, and I think that this gratuitous dramatic statements [sic] by the witness demands for a mistrial.

THE COURT: Overruled.

Tr. at 66-67.[7]

DeRosa further contends that "[d]uring *official* victim-impact evidence [at] the second stage of trial, the anger, and the errors, continued to accumulate." Aplt. Br. at 84 (italics in original). "Janet Tolbert," DeRosa asserts, "angrily directed her remarks not only to the jury, but specifically to [him]." Id. As examples, DeRosa points to the following statements by Tolbert:

I think of how the pain and terror my mother and daddy must have suffered at the time of their murders. The horror and betrayal they felt . . . .

Tr. at 588.

---

[7] As so-called "unofficial" victim-impact evidence, DeRosa also alleges that a family member of the Plummers (specifically their granddaughter Tonya) "flipped the bird" at him during trial. Aplt. Br. at 83-84. Although DeRosa's counsel brought this issue to the attention of the trial judge, the trial judge stated on the record: "Well, I have not noticed anything and I don't think the jury has noticed anything like that. [District attorney], I'll direct that you go out and advise that witness that if I see her doing it and I'm going to start watching her, and if I see her do anything like that, she'll be banished from this courtroom, and she'll be placed in the county jail." Tr. at 209.

Notably, DeRosa did not raise this as an issue either in direct appeal or in his application for post-conviction relief, and thus we conclude the issue is procedurally barred.

Although [the execution of DeRosa] will not bring them back to us, it will give us some peace of mind. Our family has suffered enough because of this man. My family pleads with you to give the death penalty.

Id. at 589.

Similarly, DeRosa argues, Jo Milligan, Gloria Plummer's sister, provided improper victim-impact testimony by testifying as follows:

. . . my sister and brother-in-law [died in a] horrible, heinous way . . .

Id. at 590.

I can only hear [my sister] in my dreams, and so many times it is . . . screams of pain and fear.

Id.

Knowing that she suffered pain and terror in her last moments is devastating. Knowing that she felt horror and betrayal from people that they knew and trusted is devastating. They were helpless, knowing that they were going to die . . . .

Id. at 591.

In short, DeRosa argues, "Janet Tolbert and Jo Milligan's testimony characterized the crime and the pain the victims felt in an inflammatory way, and Janet Tolbert pleaded with the jury *on behalf of her entire family* to sentence James DeRosa to death."[8] Aplt. Br. at 85 (italics in original).

---

[8] Both Tolbert and Milligan read to the jury written statements they had prepared prior to trial. The statements now challenged by DeRosa were contained in those written statements.

80

*a) Clearly established federal law*

DeRosa identifies Booth v. Maryland, 482 U.S. 496 (1987), and Payne v. Tennessee, 501 U.S. 808 (1991), as providing the clearly established federal law applicable to this claim. In Booth, the Court held "that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible [under the Eighth Amendment] at a capital sentencing hearing." Payne, 501 U.S. at 830 n.2. That holding was overruled by the Court in Payne. Id. at 830 and n.2. "Booth also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Id. at 830 n.2. Payne did not overrule this portion of Booth. Id. Thus, it remains constitutionally improper for the family members of a victim to provide "characterizations and opinions about the crime, the defendant, and the appropriate sentence" during the penalty phase of a capital case. Welch v. Sirmons, 451 F.3d 675, 703 (10th Cir. 2006), overruled on other grounds by Wilson v. Workman, 577 F.3d 1284 (10th Cir. 2009) (en banc) (applying de novo standard of review in circumstances where state habeas petitioner presents an ineffective assistance of counsel claim and the state appellate court declined to supplement the original trial record with outside evidence proffered by the petitioner).

*b) The OCCA's resolution of DeRosa's claims*

DeRosa raised these same arguments (except for his argument regarding a

81

member of the Plummer family gesturing to him) on direct appeal. In doing so, however, he did not argue that Janet Tolbert's first-stage testimony constituted "unofficial" victim-impact testimony. Instead, he argued simply that she provided "prejudicial testimony," and he argued that her testimony in that regard, when combined with the alleged prosecutorial misconduct, violated his right to a fair trial. In a separate part of his direct appeal brief, DeRosa argued that the second-stage testimony of Tolbert and Milligan constituted improper victim-impact testimony.

The OCCA rejected DeRosa's challenge to Tolbert's first-stage testimony (i.e., what DeRosa now classifies as "unofficial" victim-impact testimony), stating as follows:

> DeRosa argues that the trial court "should at least have sustained Appellant's objection and admonished the jury to disregard Tolbert's uncalled for comment." DeRosa did not, however, actually object to Tolbert's testimony or ask for such an admonishment, which, based upon the rest of the trial, would certainly have been given if it had been requested. This Court finds that although Tolbert's comment was improper, the record does not suggest that the State could have anticipated her response; nor does it suggest that the comment was so prejudicial that it contributed to DeRosa's convictions or his sentences.

DeRosa I, 89 P.3d at 1145 (internal footnote omitted). In turn, the OCCA concluded that, even when considered with "some of the district attorney's remarks [that] crossed the line of appropriate representation," Tolbert's first-stage testimony did not "violate due process," or result in DeRosa's "death sentence

[being] obtained through a violation of the Eighth Amendment." Id. at 1149.

The OCCA also rejected DeRosa's challenge to the second-stage testimony

of Tolbert and Milligan:

> DeRosa argues that the victim impact testimony of Tolbert and Milligan amounted to a "hyper-emotional plea for revenge" and focused too much on the emotional impact of the murders. The governing Oklahoma statute defines "victim impact" evidence as follows: "information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, . . . circumstances surrounding the crime, the manner in which it was perpetrated, and the victim's opinion of a recommended sentence." [footnote omitted] This Court has recognized that victim impact testimony should generally be restricted to these issues, though it can also be used to give the jury "a quick glimpse" of the life of the victim, to demonstrate "those unique characteristics which define the individual who has died," and to show "why the victim should not have been killed." [footnote omitted]

> While a substantial portion of the victim impact testimony of Tolbert and Milligan did address the emotional and psychological toll that the Plummer murders caused in their lives, their testimony was not exclusively emotional. Tolbert testified that the murder of her parents caused her to have sleepless nights, nightmares, and post-traumatic stress disorder. Milligan testified that the murders caused her "many sleepless nights, nightmares, acid reflux and upset stomach, post-traumatic stress disorder and all of its components, such as memory loss, depression, tears—oh, so many tears—anger, and physical pain in my heart." Milligan also noted that the loss of her sister left her without someone to consult with about "what to do about our mother."

> Both women, who lived near the Plummer home, mentioned that they had interacted with Curtis and Gloria Plummer on a daily basis and now could no longer do so. In addition, both women offered a "quick glimpse" into the lives and character traits of the Plummers.FN133 This Court finds that the testimony of Tolbert and Milligan did not go beyond the bounds of acceptable victim impact

83

testimony in this regard, and rejects DeRosa's first challenge to it.

> FN133. Tolbert noted that they were "good, hard-working people" and had "helped a lot of people in this county." Milligan testified that they were "wonderful people" who "helped so many people," had many friends, "loved their family," and "loved life."

DeRosa also argues that the victim impact evidence presented during his trial contained inappropriate characterizations of his crime and an improper recommendation regarding his sentence. He makes a general challenge to this evidence, as well as a challenge to the particular evidence presented in his case.

DeRosa first asserts that this Court has erroneously interpreted the Supreme Court's decision in <u>Payne v. Tennessee</u>, [footnote omitted] to allow for victim recommendations regarding the defendant's sentence, as well as victim characterizations of the crime. This Court has recently noted that although the Supreme Court had earlier forbidden such evidence, the decision in <u>Payne</u> left open the question of the validity of such evidence.FN135 The legislature of this State has specifically provided for the admission of this kind of victim impact evidence. [footnote omitted] And this Court has rejected claims like DeRosa's in the past. [footnote omitted] The Court will not re-examine the issue here.

> FN135. <u>See</u> <u>Murphy v. State</u>, 2002 OK CR 24, 47 P.3d 876, 885 (noting that <u>Payne</u> opinion explicitly "left open the question about admissibility of victim impact evidence regarding characterizations and opinions about the crime, the defendant, and the appropriate sentence"); <u>see also</u> <u>Payne</u>, 501 U.S. at 830 n. 2, 111 S.Ct. at 2611 n. 2 (recognizing that although <u>Booth v. Maryland</u>, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), held that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence" violated the Eighth Amendment, the Court's ruling in <u>Payne</u> was "limited" to its conclusions about the admissibility of evidence about the victim and the effect of the victim's death on the family, since other types of victim impact

84

evidence were not at issue in <u>Payne</u>).

Regarding the specific testimony presented during his trial, DeRosa argues that the testimony of Tolbert and Milligan exceeded the bounds of an appropriate sentencing recommendation and contained improper characterizations of his crime.FN138  This Court has reviewed all of the victim impact testimony and finds that the testimony did go too far, particularly in terms of Tolbert's emotional plea for the death penalty and Milligan's speculative and inflammatory claims about the victims' experience of their attack. [footnote omitted]  Nevertheless, the testimony was not "so unduly prejudicial" that it rendered DeRosa's trial "fundamentally unfair" or his sentencing "unreliable." [footnote omitted]  This Court rejects DeRosa's specific challenges to the testimony of Tolbert and Milligan, as well as his claim that the overall effect of their victim impact testimony created an unconstitutional risk that his jury would be unable to make a reliable sentencing determination in his case.FN141

> FN138. Tolbert recommended that the jury sentence DeRosa to death, saying, "I ask you, the jury, for justice. Although this will not bring them back to us, it will give us some peace of mind. Our family has suffered enough because of this man. My family pleads with you to give the death penalty."  Although Milligan did not provide a sentencing recommendation, she did provide a number of characterizations of the crime.  In particular, she referred to "the horrible, heinous way in which they died" and that Gloria Plummer "suffered pain and terror in her last moments" and that she "felt horror and betrayal from people that they knew and trusted." Milligan also referred to the Plummers as "helpless, knowing they were going to die . . . ."

> FN141. The victim impact statements in this case raise very serious questions, particularly Tolbert's sentencing recommendation, which violates our clearly established caselaw regarding the authorized "concise" and "unamplified" format for such recommendations. Nevertheless, this was a premeditated, gruesome, heinous crime against two innocent victims, and the rest

> of the trial was remarkably error free. There is no real doubt about DeRosa's guilt. Similarly, there is virtually no doubt that the jury in this case would have imposed two death sentences even without the erroneous victim impact testimony. Although I personally have qualms about whether we should ever substitute our judgment for that of a jury, I recognize that this Court has applied a harmless error analysis in this context before, see Cargle, 909 P.2d at 835, and I really have no doubt that the erroneous victim impact testimony had no bearing on the jury's decision to sentence DeRosa to death for his crimes.

Id. at 1151-52.

*c) § 2254(d)(1) analysis*

The question we must address is whether the OCCA's conclusions were contrary to, or an unreasonable application of, clearly established federal law. To be sure, the OCCA was correct in concluding that the witnesses' characterizations of the crime and what the victims likely thought or felt were improperly admitted. But, in suggesting that a trial court can permissibly allow a victim impact witness to testify as to a recommended sentence for a capital defendant, so long as that recommendation is not overly emotional, the OCCA's analysis was clearly contrary to Payne and Booth. As a result, the OCCA's prejudice analysis necessarily failed to take into account the full scope of the constitutional errors that resulted from the admission of the challenged victim impact testimony, and thus is not entitled to any deference in this federal habeas proceeding.

We therefore proceed to "determine de novo whether the erroneous

86

admission of [all of the challenged] victim impact testimony so clearly swayed the jury as to cause [DeRosa] actual prejudice as required by <u>Brecht</u>." <u>Welch v. Workman</u>, 639 F.3d 980, 1002 (10th Cir. 2011). "In doing so, we are mindful that 'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'" <u>Id.</u> (quoting <u>Brecht</u>, 507 U.S. at 634).

As we have noted, the prosecution alleged, and the jury found, the existence of two aggravating factors with respect to each of the murders. The evidence presented by the prosecution, which was essentially uncontroverted, overwhelmingly supported the jury's findings. Further, the jury was properly instructed by the trial court on the use of mitigating evidence and its role in the sentencing deliberations, as well as the proper role of victim-impact evidence. State ROA at 533-35. Consequently, we conclude that the admission of the improper portions of the victim impact testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Fry</u>, 551 U.S. at 116 (internal quotation marks omitted).

AFFIRMED.